UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-80115-Middlebooks/Matthewman

DONALD BUHLER,

        Petitioner,

vs.

SECRETARY, DEPARTMENT OF
CORRECTIONS, STATE OF FLORIDA,

        Respondent.

_____/

FILED BY _____SW_____ D.C.

Jan 26, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

## AMENDED[1] MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PETITIONER'S PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY [DE 1]

**THIS CAUSE** is before the Court upon Petitioner, Donald Buhler's ("Petitioner") Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") [DE 1]. The matter was referred to the undersigned by the Honorable Donald M. Middlebrooks, United States District Judge. *See* DE 4; 12. Respondent, Secretary, Florida Department of Corrections ("Respondent"), has filed a response to the Petition [DE 10], an Appendix [DEs 10-1; 10-2], and several transcripts [DE 11-1; 11-2]. Petitioner has filed a reply [DE 17]. The Court has reviewed and carefully considered the Petition, the response, the reply, the appendix and exhibits, the transcripts, and all pertinent portions of the underlying criminal file.

_____

[1] This Amended Report and Recommendation is amended solely to include note 14, *infra*, which was inadvertently omitted in the prior Report and Recommendation [DE 18].

## I.      **BACKGROUND**

This case originated in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (case number 50-2016-CF-007497-MB). Petitioner was charged with and later tried for one count of sexual battery upon a person less than twelve years of age (Count 1), and two counts of lewd or lascivious molestation on a person less than twelve years of age (Counts 2 and 3). [DE 11-1 at 1165–66]. Count 2 was for lewd or lascivious molestation of a minor female victim (hereinafter referred to as "H") that was six years old at the time of the offense. [DE 11-1 at 610]. Count 3 was for lewd or lascivious molestation of a minor male victim that was approximately nine years old at the time of the offense. [DE 11-1 at 853–54]. Notably, "H" and the minor male victim are siblings.

Following a jury trial, on June 28, 2018, Petitioner was found and adjudicated guilty on Counts 1 and 2. [DE 11-1 at 1327].[2] However, the jury found Petitioner not guilty on Count 3.[3] [DE 11-1 at 1327]. Accordingly, on July 27, 2018, the trial court sentenced Petitioner to life imprisonment on Count 1, with 730 days of jail credit, and to life imprisonment on Count 2, with no credit for time served, with the sentence on Count 2 to run consecutively to the sentence on Count 1. [DE 10-2 at 2–5]. The trial court also declared Petitioner to be a sexual predator based on his adjudication of guilty on Counts 1 and 2. [DE 10-2 at 6–8].

Petitioner filed a timely direct appeal of his conviction and sentence to the Fourth District Court of Appeal (Case No. 4D18-2286). [DE 10-2 at 156]. On direct appeal, Petitioner argued that the trial court erred in: (1) admitting the out-of-court statements of H over Petitioner's objection,

---

[2] The Court cites the transcript because the State failed to file the charging documents or the Judgments as part of this federal habeas case.

[3] The transcript mistakenly states "Count II" twice and omits "Count III." *See* DE 11-1 at 1327.

where the statements did not have the requisite reliability or trustworthiness under section 90.803(23); (2) denying Petitioner's motions to strike the testimony of H and his motion for mistrial where H was not competent to testify; (3) overruling Petitioner's objection to the victims' mother's testimony that she was in fear for the safety of herself and her children because of Petitioner; (4) granting the State's for cause challenge as to Juror Horrobin; (5) allowing a State expert to testify concerning general profiles of pedophiles and to children's behavior in other child sexual abuse cases; (6) failing to conduct a *Richardson* inquiry following the State's failure to list Child Protection Team ("CPT") interviewer Katharine Muehlberg as an expert;[4] (7) failing to conduct a *Richardson* inquiry into the State's failure to comply with the notice requirement of section 90.803(23)(B); (8) denying Petitioner's motion for a jury of twelve persons for his capital sexual battery charge; and (9) giving a jury instruction on sexual battery that misstated a material element. [DE 10-2 at 12–13].

Stated differently, Petitioner raised nine claims on direct appeal—eight of which he now raises again, as indicated immediately below in Section II(i). On October 3, 2019, the Fourth DCA *per curiam* affirmed Petitioner's conviction and sentence. [DE 10-2 at 156]; *see also Buhler v. State*, 280 So. 3d 67 (Fla. 4th DCA 2019). Subsequently, on October 22, 2019, the Fourth DCA denied Petitioner's motion for a written opinion.[5] [DE 10-2 at 166].

---

[4] Katharine Muehlberg was previously known as Katharine Stangeland. [DE 11-1 at 1018–19].

[5] It does not appear Petitioner sought review before the Florida Supreme Court. Moreover, the parties do not address the issue in their papers. Nonetheless, it would appear that the denial of Petitioner's motion for a written opinion by the Fourth DCA resulted in the Florida Supreme Court being without jurisdiction to review the *per curiam* affirmance. *See Beaty v. State*, 684 So. 2d 206 (Fla. 2d DCA 1996) ("Although Mr. Beaty could file papers in the Florida Supreme Court, the constitution gives that court no appeal jurisdiction or discretionary jurisdiction to review this court's *per curiam* affirmance of Mr. Beaty's judgment and sentence because it was rendered without a written opinion."). Since the parties neglected to address this issue, the Court will not address it further.

## II.      PETITION, RESPONSE, AND REPLY

### i.      Petition [DE 1]

In the underlying Petition, Petitioner seeks federal habeas relief, arguing that the trial court violated his federal constitutional rights and erred in: (1) denying Petitioner's motions to strike the testimony of H and his motion for mistrial where H was not competent to testify ("Ground One"); (2) admitting H's out-of-court statements over objection, where the statements did not have the requisite reliability or trustworthiness under section 90.803(23) ("Ground Two"); (3) overruling Petitioner's objection to the victims' mother's testimony that she was in fear for the safety of herself and her children because of Petitioner ("Ground Three"); (4) granting the State's cause challenge as to Juror Horrobin ("Ground Four"); (5) allowing a State expert to testify to general profiles of pedophiles and to children's behavior in other child sexual abuse cases ("Ground Five"); (6) failing to conduct a *Richardson* inquiry following the State's failure to list CPT interviewer Katharine Muehlberg as an expert ("Ground Six"); (7) denying Petitioner's motion for a jury of twelve persons for his capital sexual battery charge ("Ground Seven"); and (8) giving a jury instruction on sexual battery that misstated a material element ("Ground Eight"). [DE 1]. For organizational purposes, Petitioner's specific arguments under Grounds One through Eight are presented in more detail, *infra*.

### ii.      Response [DE 10]

The State concedes that the Petition "appears timely under the time limit provision of 28 U.S.C. § 2244(d)." [DE 10 at 6]. However, the State contends that Petitioner failed to exhaust Grounds One through Eight before presenting them in his federal habeas petition. *Id.* at 6–8. According to the State, Petitioner's arguments on direct appeal "briefly mention[ed] his rights to

confrontation, 'due process,' a 'fair trial,' and a 'fair and impartial jury.'" *Id.* at 7. However, in making such arguments, the State maintains that Petitioner did not "articulate any federal legal theory." *Id.* at 7. Indeed, the State argues that "[s]imply mentioning a Federal Constitutional Amendment in a state court proceeding does not exhaust an argument for federal habeas corpus review." *Id.*

Additionally, beyond arguing that Petitioner failed to properly exhaust his claims, the State argues that the Petition [DE 1] should be denied as to Grounds One through Eight on the merits. *Id.* at 8–40. Because Petitioner's arguments are presented in more detail below for organizational purposes, so too are the State's responses to those arguments.

### iii.   Reply [DE 17]

In reply, Petitioner first argues that he properly exhausted his claims and satisfied the "fair presentation" or exhaustion requirement by "specifically argu[ing] that the resolution of [each] issue [raised on direct appeal] resulted in a violation of his federal constitutional rights." [DE 17 at 1–2]. Next, Petitioner either relies on argument from the Petition, or expands upon those arguments with respect to Grounds One through Eight. In this regard, Petitioner's arguments in his reply as to each Ground are presented in more detail, *infra*.

### III.   ANALYSIS REGARDING EXHAUSTION

Pursuant to 28 U.S.C. § 2254(b)–(c), petitioners are required to exhaust their claims by fairly presenting them to the state courts for adjudication before presenting them in a federal habeas petition. When petitioners do not properly present their claims, exhaust their claims, and comply with the applicable state procedure, § 2254 may bar federal review of those claims in federal court. *See Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (citing 28 U.S.C. § 2254(b)–(c)).

"It is not sufficient merely that the federal habeas petitioner has been through the state courts, . . . nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1343–44 (11th Cir. 2004). "Rather, in order to ensure that state courts have the first opportunity to hear all claims, federal courts 'have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.'" *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). While this "do[es] not require a verbatim restatement of the claims brought in state court, . . . [it does] require that a petitioner presented his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'" *Id.* at 1302 (quoting *Kelley*, 377 F.3d at 1344–45). Moreover, "[m]erely citing to the federal constitution is insufficient to exhaust a claim in state court." *Norman v. Sec'y, Fla. Dep't of Corr.*, No. 15-cv-1045-J-34JRK, 2018 WL 2971031, at *7 (M.D. Fla. June 13, 2018) (citing *Anderson v. Harless*, 459 U.S. 4, 7 (1982)).

Here, the State has attached Petitioner's Initial Brief on direct appeal. [DE 10-2 at 10–85]. In his Initial Brief, with respect to Grounds One, Two, Three, and Four, Petitioner stated that "[t]he error denied [Petitioner] his rights to due process, confrontation, and a fair trial. Amends. V, VI, XIV, U.S. Const.; Art. 1 §§ 2, 9, 16, and 22, Fla. Const." *Id.* at 33, 48, 58, 60. With respect to Grounds Five, Six, and Eight, Petitioner stated that the error "denied [Petitioner] his rights to due process and a fair trial. Amends. V, VI, XIV, U.S. Const.; Art. 1 §§ 2, 9, 16, and 22, Fla. Const." *Id.* at 63, 67, 83–84. Finally, as to Ground Seven, Petitioner argued that "[t]he lack of a 12 person

jury violated [Petitioner's] right to a fair and impartial jury pursuant to the Sixth Amendment to the United States Constitution and Article I, Section 22 of the Florida Constitution." *Id.* at 75–76.

Under each ground now argued in the Petition, Petitioner's arguments—including his citation to the applicable case law—are practically identical to the respective arguments raised on direct appeal. Accordingly, the Court finds that a "reasonable reader would understand each claim's particular legal basis and specific factual foundation," and that Petitioner's citation to federal law on direct appeal afforded the state court a "meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *McNair*, 416 F.3d at 1302 (citation omitted).

However, the Court does note that, while Petitioner referenced several Amendments to the United States Constitution, for many of his claims, it is somewhat questionable whether he "articulate[d] and fairly present[ed] a federal constitutional claim" on account of the conclusory reference to the Amendments, and therefore there is some question as to whether Petitioner properly exhausted *all* of his claims. *See Norman*, 2018 WL 2971031, at *7. In any event, pursuant to 28 U.S.C. § 2254(b)(2), the Court has authority to address unexhausted claims when a denial is appropriate on the merits. Thus, even assuming Grounds One through Eight were not properly exhausted, the Court would still be able to examine the merits of the Petition. *See Davis v. Fla.*, No. 18-22622-CV, 2020 WL 7481583, at *3 (S.D. Fla. Nov. 4, 2020), *report and recommendation adopted sub nom. Davis v. Fla. Dep't of Corr.*, No. 18-22622-CIV, 2020 WL 7480818 (S.D. Fla. Dec. 18, 2020). In this regard, the Court has reviewed the Petition on the merits, as set forth below, but finds it substantively unavailing. The Undersigned United States Magistrate Judge therefore

**RESPECTFULLY RECOMMENDS** that the United States District Judge review the merits of the Petition [DE 1], and fully deny the Petition [DE 1], for the reasons stated in Section IV, *infra*.

### IV.     ANALYSIS REGARDING PETITIONER'S SUBSTANTIVE CLAIMS

Pursuant to 28 U.S.C. § 2254(d), an individual in state custody is entitled to federal habeas corpus relief only on the ground that he is in custody in violation of the United States Constitution or laws or treaties of the United States. To obtain habeas corpus relief from a federal court, a prisoner must demonstrate that the state court's ruling on the claim: 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2) (2018); *see also Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Fugate v. Head*, 261 F.3d 1206, 1215–16 (11th Cir. 2001).

"A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in this Court's cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams*, 529 U.S. at 405–06. "A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies such precedents to the facts in an objectively unreasonable manner." *Id.* In the context of habeas petitions, "clearly established Federal law" refers to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision. *Hall v. Head*, 310 F.3d 683, 690 (11th Cir. 2002) (citing *Williams*, 529 U.S. at 412). Federal courts are required to presume the correctness of the state court's factual findings unless the petitioner overcomes them by clear and

convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

The Supreme Court has repeatedly held that "[t]he petitioner carries the burden of proof" and that the § 2254(d)(1) standard is a high hurdle to overcome. *See Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)); *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). State court decisions must be given a strong presumption of deference even when the state court adjudicates a petitioner's claim summarily. *See Richter*, 562 U.S. at 96–100; *Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th Cir. 2011).

i.  **Ground One: The state trial court erred in denying Petitioner's motion for mistrial and motions to strike the testimony of H where H was not competent to testify**

a. Petition

Petitioner asserts that his constitutional rights to due process, to confrontation, and to a fair trial were violated when the state trial court ruled that H was competent to testify and denied his motions to strike the testimony of H and his motion for mistrial. [DE 1 at 4]. Specifically, Petitioner argues that H's actions in: (1) putting her fingers in her ears; (2) turning her back to defense counsel; (3) failing to turn around; (4) curling up into a ball; and (5) being unwilling to look at anything that defense counsel tried to show her, meant that H was incompetent to testify as a witness. *Id.* at 5. Moreover, Petitioner notes that from the very beginning, H was reluctant to take the stand "and [that] the situation was exacerbated by the prosecutor promising H that she would only have to answer a couple of quick questions." *Id.* at 6. Indeed, Petitioner quotes the trial transcript at length in support of his argument that H was incompetent to testify, noting defense

9

counsel's substantial difficulty in cross-examining H based on her behavior and her actions in consistently stating that she did not remember certain events. *Id.* at 6–10.

  According to Petitioner, "[c]ontrary to the State's position, more than knowing the difference between the truth and a lie is required to make a witness competent to testify." *Id.* at 11. Petitioner argues that:

> In this case, the record demonstrates the child was not capable of observing and recollecting facts as shown by her inability to remember facts. For example, she could not remember telling her mother that Petitioner . . . had pinched her bottom. The record also demonstrates the child was not capable of narrating those facts to the court or to a jury, especially where she would turn to face the wall and place her fingers in her ears and refused to look at/listen to exhibits when asked by counsel and the state trial court. Finally, while the child may have understood the difference between the truth and a lie, it was not shown she had a moral sense of the obligation to tell the truth.

*Id.* In this regard, Petitioner argues that "the state trial court erred in failing to determine the child's competency as a witness with reference to all the criteria, and allowing the child to testify on the basis of its erroneous competency determination." *Id.*

  Thereafter, Petitioner cites extensively to *United States v. Samuel M.*, No. CR 13-0088 JB, 2013 WL 2284970 (D.N.M. May 30, 2013), as an example of a case in which a federal court concluded a minor victim was incompetent to testify and therefore unavailable for purposes of cross-examination. *Id.* at 12–17. Petitioner maintains that, as was the case in *Samuel M.*, "H was unavailable for cross-examination in violation of Petitioner['s] . . . Confrontation Clause rights under the Sixth Amendment to the United States Constitution when she lost her composure and refused to answer the *vast majority* of questions that were asked by defense counsel on cross-examination." *Id.* at 17–18.

Petitioner additionally argues that the state trial court's error in allowing H's testimony and in denying Petitioner's motion for mistrial in this case was not harmless under *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986), as "the error resulted in a violation of Petitioner['s] . . . Confrontation Clause rights." *Id.* at 18–19. Thus, Petitioner contends that the state courts' rulings (that is, the state trial court's rulings and the state appellate court's affirmance of those rulings) "were based on an unreasonable determination of the facts in light of the evidence contained in the state court record" and that the state courts' rulings in this case "were contrary to and an unreasonable application" of Petitioner's constitutional rights. *Id.* at 19.

b.  Response

The State begins by arguing that Petitioner's argument "does not demonstrate that the state court decisions were contrary to, or an unreasonable application of, clearly established federal law set forth by the Supreme Court" and that Petitioner "does not show that the state court's decisions were based upon an unreasonable determination of facts in light of the record before the state court." [DE 10 at 9]. To this end, relying upon the federal habeas standard, the State points out that federal courts "are generally reluctant to second-guess state evidentiary rulings" and that state evidentiary rulings are subject to harmless error analysis. *Id.*

Thereafter, the State argues that this Court should reject Petitioner's arguments for the reasons set forth in *Burns v. Inch*, 2020 WL 8513758 (N.D. Fla. Dec. 8, 2020). *Id.* at 10. That is, because the trial court afforded Petitioner a hearing on the issue of H's competency—and because "a rational trier of fact could have found beyond a reasonable doubt that [P]etitioner committed sexual battery and lewd and lascivious molestation based upon the CPT interview, [H's] deposition testimony, and [P]etitioner's admissions"—the State argues that Petitioner's argument under

11

Ground One should be rejected. *Id.* More specifically, turning to the facts of the case, the State argues that, while it is true H had difficulty testifying at trial in front of a room full of strangers, she was not incompetent to testify, as she: (1) demonstrated the ability to distinguish between the truth and a lie; (2) was able to accurately recite certain background information; and (3) demonstrated an ability to tell the truth when deposed by Petitioner. *Id.* at 11. Indeed, the State maintains that "[t]he victim's trial testimony, along with her deposition and her statement to the child protective team, demonstrated she could observe facts, recollect them, and relate them correctly to the jury." *Id.* at 12.

The State next distinguishes several cases cited by Petitioner. *Id.* at 12. With respect to *In the Interest of M.A.*, 477 So. 2d 47 (Fla. 4th DCA 1985), the State argues the vast differences in the age of the victim (the victim was three years old at the time of his testimony in that case) renders the case inapposite. *Id.* at 12–13. As to *Wade v. State*, 586 So. 2d 1200 (Fla. 1st DCA 1991), the State argues that the trial court in that case "did not review a pretrial deposition and a statement to a child protective team prior to ruling on the victim's competency" and that the victim in that case was not "unequivocally capable of separating fact from fantasy." *Id.* at 13. With respect to *Griffin v. State*, 526 So. 2d 752 (Fla. 1st DCA 1988), the State argues that the victim did not understand the duty to tell the truth or the duty not to lie and that the "competency evaluation" in that case was *preliminary* to the victim's deposition, and further points out that there "was no evidence corroborative of the allegations of sexual misconduct." *Id.* at 14. And finally, as to *United States v. Samuel M.*, No. CR 13-0088 JB, 2013 WL 2284970 (D.N.M. May 3, 2013), the State notes that the case involved a four-year-old victim, that the victim in that case shut down minutes into the cross-examination and was unable to continue, and that the victim in that case only

answered eight questions—all circumstances which are not present in the instant case. *Id.* at 15. Additionally, the State points out that in the instant case, H's deposition was ultimately entered into evidence. *Id.* at 15.

Nonetheless, the State argues "any purported error caused by the trial court's evidentiary ruling would be harmless beyond a reasonable doubt and would not support habeas relief because the purported error did not have 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 15 (quoting *Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998)). As noted by the State, "[t]he victim's CPT interview was entered into evidence, as were the admissions [P]etitioner made during the controlled call. Petitioner was also able to cross-examine the victim during trial and further attack her testimony with the pretrial deposition." *Id.* at 15–16.

 c.  <u>Reply</u>

Petitioner begins by arguing that, "[c]ontrary to [the State's] assertion – and unlike *Burns* – the state trial court in this case did *not* afford Petitioner . . . 'an appropriate hearing on the issue of the victim's competency.'" [DE 17 at 2]. Petitioner argues that, when defense counsel argued that H was "completely unavailable" for cross-examination in violation of Petitioner's constitutional rights and had become "incompetent to testify," the trial court merely responded with "you know I'm not going to find her incompetent." *Id.* at 3.

Further, because the State "does not discuss H's competency as it related to discussing the allegations in this case," Petitioner argues that the State "has not disputed that the record demonstrates that [H] . . . was not capable of narrating relevant facts to the court or to a jury – especially where she would turn to the wall and place her fingers in her ears and refused to look at/listen to exhibits when asked to by counsel and the state trial court." *Id.* at 3 n.2. Indeed,

Petitioner argues that the State's assertion that H would observe facts, recollect them, and relate them correctly to a jury was directly refuted by H's testimony at trial, during which she put her fingers in her ears, turned her back to defense counsel and never turned around, curled up into a ball, and was not willing to look at anything defense counsel showed her. *Id.* at 3–4.

Moreover, to the extent the State argues that Petitioner's "admissions corroborated his sexual misconduct," Petitioner argues that "the record is clear that Petitioner . . . did *not* admit to the charged conduct" and "[a]t most . . . acknowledged to engaging in 'horseplay' (i.e., conduct that was not sexual in nature)." *Id.* at 4. And finally, Petitioner again cites heavily to *United States v. Samuel M.,* analogizing the instant case in numerous respects. *Id.* at 4–6.

d.   Legal Standard & Analysis

"[T]he prime test of testimonial competence of [a child] witness is his or her intelligence, rather than his or her age, and in addition, whether the child possesses a sense of obligation to tell the truth." *Lloyd v. State*, 524 So. 2d 396, 400 (Fla. 1988); *see also Flores v. State*, 92 So. 3d 855, 856 (Fla. 4th DCA 2012) ("When the court is evaluating a child's competency, it applies a two-part test, based upon the child's: (1) intelligence and (2) sense of obligation to tell the truth."). "[B]efore finding a child competent to testify, 'the trial court should consider (1) whether the child is capable of observing and recollecting facts, (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the obligation to tell the truth.'" *Wade v. State*, 586 So. 2d 1200, 1203 (Fla. 1st DCA 1991) (quoting *Griffin v. State*, 526 So. 2d 752, 753 (Fla. 1st DCA 1988)).

In the instant case, with respect to H's intelligence, H's mother testified that H did well in elementary school and that she was developmentally on track. [DE 11-1 at 598–99]. H was also

clearly able to testify to her age (H was eight years old at the time of trial), her date of birth, the names of her family members, her grade level, the school she attended, and her activities in Cub Scouts. *Id.* at 523–28. And, H demonstrated that she knew the difference between the truth and a lie. *Id.* at 528. Consequently, H's intelligence was adequately proven. *See Baker v. State*, 674 So. 2d 199, 200 (Fla. 4th DCA 1996) ("Under the two prong test in *Lloyd*, the child proved her intelligence by knowing her age, where she went to school, where she went to church and could identify the colors of people's clothing.").

Further, with respect to H's sense of obligation to tell the truth, during trial: (1) H swore to tell the truth; (2) H promised that she would talk about the truth; and (3) H's mother testified that—prior to discussing Petitioner's charged conduct with H—she made a "pinky promise" with H that H was not in trouble, and that the two of them did not break a "pinky promise." [DE 11-1 at 523, 528, 610]. Moreover, during H's deposition—the relevant portions of which were admitted into evidence due to H's difficulty testifying at trial—H acknowledged promising to tell the truth and acknowledged the importance of not leaving anything out. [DE 11-2 at 237]. Thus, although it appears H did not specifically testify that it was wrong to lie or to avoid telling the truth or discuss the consequences of not telling the truth, the record sufficiently demonstrates H's moral obligation to tell the truth.

The issue, then, is H's ability to observe and recollect facts, and to narrate those facts to the jury. *Wade*, 586 So. 2d at 1203. In this regard, outside the presence of the jury, H could be seen and/or heard whining and crying when she first entered the courtroom. [R. 11-1 at 517]. Similarly, in the presence of the jury, H initially refused to raise her right hand and there was some difficulty in swearing her in as a witness. *Id.* at 522. Moreover, despite the State promising to ask H just "a

couple things," *id.* at 519, the State proceeded to ask H multiple questions, with H at one point turning her chair around to face the wall. *Id.* at 534.

Subsequently, immediately prior to cross examination, the State noted that H was "in a lot of distress," and the trial court expressed its concern over whether H could continue testifying. *Id.* at 538–39. In any event, defense counsel proceeded to cross-examine H. *Id.* at 540. During cross-examination, H: (1) did not remember the room in which Petitioner had purportedly licked her; (2) did not remember that she had met with CPT interviewer Ms. Muehlberg; (3) did not remember being shown a video of the CPT interview; (4) stated that being shown the video would not help her remember; (5) did not remember telling Ms. Muehlberg that Petitioner touched her while she was in bed; (6) did not remember defense counsel asking her questions during a deposition; and (7) frequently answered that she did not remember in response to multiple additional questions posed by defense counsel. *Id.* at 70. In fact, H admitted that she was not listening and had her ears covered when defense counsel attempted to impeach H with a video of her deposition, and when later asked if she would look at the video of her deposition, simply responded "no." *Id.* at 569, 571. Further, the record demonstrates that H was facing the wall with her back to defense counsel during at least a portion of her cross-examination. *Id.* at 546.

Consequently, based upon the difficulty questioning H, defense counsel moved to have H declared incompetent to testify, moved to strike H's testimony, and moved for a mistrial. *Id.* at 579. In response, the court denied all three of defense counsel's *ore tenus* motions. *Id.* at 580–84. With respect to the motion to declare H incompetent in particular, the trial court stated that "you know I'm not going to find her incompetent. She's 8 years old; she was answering questions for a while, it's been a long time, it's a long time for -- you know an hour is a long time for a 35 year old

to be on the stand." *Id.* at 580. Thereafter, because it appeared H was unwilling to respond "to questions with anything other than 'I don't remember' in regards to" the video deposition, defense counsel declined to continue H's cross-examination. *Id.* at 584–88.

While H's behavior and testimony is certainly troubling, H testified that it was scary and that she was embarrassed to be there testifying. *Id.* at 529. Additionally, with respect to H's competency, the trial court had before it the benefit of H's deposition and CPT interview, which helped establish that H was, in fact, able to observe and recollect facts and to narrate those facts when she was not in a public setting in the presence of a number of strangers. To the extent H had extreme difficulty testifying in front of a group of strangers, the trial court acknowledged Petitioner's "Constitutional right[s]" and offered Petitioner an additional attempt to bring H back into the courtroom and to either continue H's cross-examination in court, or to continue H's cross-examination via CCTV. *Id.* at 849–50, 994. The trial court even noted that it would allow in H's deposition testimony as evidence even if defense counsel chose to continue with H's cross examination. *Id.* at 995.

However, after a brief recess, defense counsel (and Petitioner) decided to "simply play the portions of the deposition video that [Petitioner] believe[s] are relevant to impeach" H instead of continuing any cross-examination. *Id.* at 997. Thus, Petitioner's attempts to argue that H was unavailable for cross-examination are not well-taken and likely constitute invited error. But even assuming it *was* error to allow H's testimony and to find her competent to testify, any such error was harmless beyond a reasonable doubt. This is because defense counsel was able to enter the portions of the deposition testimony into evidence that it sought to cross-examine H on and impeach her with, and because of Petitioner's own statements made during a controlled call.

17

Specifically, although certainly not an outright admission, Petitioner's statements in the controlled call (which were entered into evidence at trial) are particularly damning. The following exchange took place during the controlled call between H's mother and Petitioner:

| | |
|---|---|
| [PETITIONER]: | You uhm -- I -- I -- I -- I -- at all times I'd stay out from underneath her underwear, but you know uhm -- you know when I got fresh you know like I'll hit her underwear or her shirt, pinch her butt, pinch her cheek, her thighs and stuff. But that's why I want to talk to you so you'd understand you know where I'm coming. |
| [THE MOTHER]: | But how could -- |
| [PETITIONER]: | It was -- look it was just horseplay and -- and that's -- that's all it was. Yeah, I got fresh and it's -- it's just my adornment for the -- for [H], it's not what it pro -- what it uhm -- seems like. |
| [THE MOTHER]: | But did you -- but did you -- did you like -- was there anything under the underwear? |
| [PETITIONER]: | *(long pause)* Uh, uh, maybe, but it wasn't intentional. It was just you know me being fresh and kidding and -- and -- and -- |
| [THE MOTHER]: | Did you -- |
| [PETITIONER]: | I don't know -- |
| [THE MOTHER]: | -- did you like -- did -- oh, God baby. Uh, did -- did you like finger her? |
| [PETITIONER]: | No, No. What I'm -- what I'm trying to do is just find her ticklish spot on her -- you know on her -- on her thigh, on her hip, around her abdomen and you know -- and pinching and just you know squeezing for you know tickling, you know? |
| [THE MOTHER]: | But she said -- |

18

| | |
|---|---|
| [PETITIONER]: | Yeah, I -- I might have been underneath the privates but -- |
| [THE MOTHER]: | Well, was it often? Like was it every time or just -- I don't know – |
| [PETITIONER]: | No, no, no -- |
| [THE MOTHER]: | -- when you've had too much to drink type -- |
| [PETITIONER]: | -- no. |
| [THE MOTHER]: | -- of thing or was it like every time? |
| [PETITIONER]: | I -- I -- I -- no. Uh, you know maybe it was too much to drink. . . . |

*Id.* at 1088–89. Additionally:

| | |
|---|---|
| [THE MOTHER]: | . . . . But uhm -- did you really lick her? Because she's saying you did, and that is just -- |
| [PETITIONER]: | You know and it -- and it uhm -- in a playful manner I might go "boom-boom-boom-boom," or you know blowing -- either blowing farts or you know uhm -- just giving kisses uhm -- you know I gave it -- you know blowing -- blow farts and kisses on her belly, and you know sometimes she squirms and she moves, and yes so I got close to the area but -- |
| [THE MOTHER]: | You got close -- |
| [PETITIONER]: | -- not you know -- |
| [THE MOTHER]: | -- to that area like the inside of her thigh or her tooshie? |
| [PETITIONER]: | No, like you know -- you know sometimes she'll swing her leg out and stuff and yeah I accidentally touched it and that's not my intention to do that. |
| [THE MOTHER]: | But you touched -- that's what I'm saying -- you touched what; you touched her butt, you touched her |

19

|  |  |
|---|---|
|  | panties, you touched her thigh, you touched her vagina -- |
| [PETITIONER]: | You know -- |
| [THE MOTHER]: | -- you touched her labia? I mean did you -- |
| [PETITIONER]: | -- I -- I -- I -- |
| [THE MOTHER]: | -- lick her crotch like you do mine? |
| [PETITIONER]: | No, no. |
| [THE MOTHER]: | Well, she's saying you did. She's showing me like the clit area; she's showing me the clit area of being simply where you like were trying to touch her where she thinks you were trying to touch or something like that. I mean did you lick that or touch that like her clit? |
| [PETITIONER]: | *(long pause)* No, no. You know if -- if the a -- the way the anatomy is sometimes the way she moves and -- and I just keep tickling or blowing kisses or something blowing farts is really what it is -- |
| [THE MOTHER]: | I don't know -- |
| [PETITIONER]: | -- too. |
| [THE MOTHER]: | I know, I know -- |
| [PETITIONER]: | I don't -- |
| [THE MOTHER]: | Okay. |
| [PETITIONER]: | -- stay in the area long. You know baby I'm -- I'm trying to be playful and loving with [H] and -- and you know I don't want them to feel that way. |
| [THE MOTHER]: | I know, that's -- like I -- like I said, if it's -- if you're drinking too much you know -- I mean let's face it all of us you know we get drunk we get frisky, you know? |

20

| [PETITIONER]: | I was right to blame that on what it is, but you know realistically bad behavior uhm -- on my part. |

*Id.* at 1092–94. And, there was also the following exchange:

| [THE MOTHER]: | …. If you're saying it was like no big deal okay then I believe you, all right? And it was just above the underwear. If we can just know that this was just a one-time thing, may -- you know yes or no, . . . |
| [PETITIONER]: | And I said it was the one-time thing. And yeah, more than likely I was drinking too much. |
| [THE MOTHER]: | Did you do it? Did you put her mouth -- your mouth on her tooshie? |
| [PETITIONER]: | I may have accidentally, but it was only in horseplay. |

*Id.* at 1104. Simply stated, while not an outright admission, the State argued during closing argument that Petitioner's statements amounted to what is essentially a confession. The Court agrees. Petitioner blamed certain actions on having "too much to drink," acknowledged "bad behavior" on his part, and admitted to accidentally touching H's "tooshie"—the term H's family used for vagina. Consequently, the controlled call, combined with the CPT interview and H's deposition testimony, rendered any potential error in H's testimony at trial being admitted harmless beyond a reasonable doubt.

Petitioner relies on several cases, but as noted by the State, all of those cases are inapposite. In *In Interest of M.A.*, 477 So. 2d 47 (Fla. 4th DCA 1985), the victim was just three years old. *Id.* at 47. While to be sure the victim's age is not paramount in a competency analysis, the appellate court in that case noted that "[a] reading of the portion of the transcript of the hearing wherein the state attempted to qualify the victim as a competent witness, together with the testimony finally extracted from the victim after much coaxing and cajoling, demonstrates that the victim's

21

testimony was too unreliable to use as a basis for adjudicating appellant guilty of the charges." *Id.* at 48. Here, in contrast, the combination of H's deposition, her CPT interview, and the questions she was able to answer without issue at trial rendered her competent as a witness.

Likewise, in *Wade v. State*, 586 So. 2d 1200 (Fla. 1st DCA 1991), "although the child was asked to recollect facts during the competency determination, the questions were mostly directed towards recently observed events" and "there was no attempt to demonstrate during voir dire that the child was capable of recollecting events which occurred between eight months and two years prior." *Id.* at 1203. In the instant case, H was asked about events from nearly two years prior and was able to discuss the events at issue in her CPT interview (which was conducted around the time the incident was reported in July of 2016) and in her deposition (which was taken in January 2017). [DE 11-2 at 210–261]. Further, in *Griffin v. State*, 526 So. 2d 752 (Fla. 1st DCA 1988), "[t]he competency examination was conducted as a preliminary to the child's videotaped deposition" and the record "contain[ed] no evidence corroborative of the allegations of sexual misconduct." *Id.* at 755. Here, the controlled call corroborated H's testimony by establishing that Petitioner at least accidentally put his mouth on H's "tooshie." And, the trial court had the benefit of H's CPT interview and deposition testimony to help establish that H was competent to testify despite whatever difficulty she had with testifying at the trial itself.

Finally, while Petitioner cites at length to *United States v. Samuel M.*, No. CR 13-0088 JB, 2013 WL 2284970 (D.N.M. May 3, 2013), the court in that case struck the victim's "entire direct testimony for her failure to provide answers on cross examination in violation of Samuel M.'s Confrontation Clause rights," as the victim refused to answer questions that went to the heart of her direct testimony. *Id.* at *18. On this matter, the victim in that case "was . . . able to sit through

only a few minutes of cross-examination, and . . . provided answers only to eight of Samuel M.'s eleven questions, before the United States asked to take a five-minute break and, upon returning, submitted that [the victim] could not answer any further questions." *Id.* at *7.

In the instant case, however, Petitioner's cross-examination of H was over three times as long as her direct examination. In total, the State's direct examination of H lasted approximately eleven minutes. *See id.* at 522, 538. Defense counsel's cross-examination, in turn, lasted for approximately thirty minutes. *See id.* at 540–571. While it is true H had difficulty testifying and stated she could not remember in response to several important questions, defense counsel was able to enter H's deposition testimony into evidence for impeachment purposes, and it was ultimately *defense counsel* that chose not to continue to cross-examine H or to attempt to cross-examine her via CCTV outside the direct presence of the jury.

Thus, in short, Petitioner has failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, or that such rejection is based on an unreasonable determination of facts. Accordingly, the Undersigned United States Magistrate Judge **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground One.

ii.     **<u>Ground Two: The state trial court erred in admitting H's out-of-court statements over Petitioner's objection where the statements did not have the reliability or trustworthiness safeguards required under section 90.803(23), Florida Statutes</u>**

a.   <u>Petition</u>

Petitioner argues that the state trial court's admission of child hearsay was erroneous, and that the error denied Petitioner "his rights to due process, confrontation, and a fair trial." [DE 1 at 19]. Specifically, Petitioner contends that under section 90.803(23), Florida Statutes—which

requires the source of the statement to be trustworthy and for the time, content, and circumstances of the statement to provide sufficient safeguards of reliability—the trial court "did not address important circumstances needed to make a determination as to the trustworthiness and reliability of the statements."[6] *Id.* at 20. Indeed, Petitioner maintains that the state trial court in this case did not make specific findings of fact on the record, and merely "had the State write up the order [on child hearsay] with the findings." *Id.* at 21. Further, Petitioner contends "the state trial court did not make specific findings that the time, content and circumstances of the out-of-court statements met the strict requirements of reliability, nor did the state trial court analyze the specific statements sought to be introduced." *Id.*

Still further, Petitioner argues the state trial court did "not address the problems with the statements." *Id.* at 22. In this regard, Petitioner points to H repeatedly denying that Petitioner had touched her "tooshie" with anything but his fingers, only changing her answer when pressured by the CPT interviewer about something the child's mother said indicating otherwise. *Id.* at 22–24. According to Petitioner, "the constant pressure of not accepting H's answers, telling H that other people were telling things different than she was saying, and by suggesting H was calling her mother a liar by her denials – is the recipe for an unreliable statement." *Id.* at 25. Petitioner also points to the delay in H reporting the incident to her mother, and to H's CPT interview being "the opposite of a spontaneous statement." *Id.* at 25–26.

Subsequently, Petitioner maintains that the state trial court "recognized there were inconsistencies in H's statements but did not discuss them, and in essence totally ignored them by

---

[6] Although unclear from the Petition, H's out-of-court statements refers to H's statements made on the night of July 3, 2016 to her mother, and to H's out-of-court statements made during a CPT interview.

stating the inconsistencies of the statements 'goes to weight not admissibility.'" *Id.* at 26 (quoting R. 603). As to these inconsistencies, Petitioner notes the discrepancies between H's statement to her mother and H's CPT interview, maintaining that "consistency in the contents of [a] child's statements is critical to determining reliability." *Id.* at 26–28.

Finally, Petitioner points to: (1) the lack of evidence regarding H's mental state when the abuse was reported and regarding her ability to distinguish between fantasy and reality; (2) the state trial court's erroneous indication that there could be no possible motive to lie; (3) the state trial court's erroneous consideration of evidence which corroborated the statements in determining that the statements were reliable; and (4) H's inability at trial to be cross-examined as reasons the state trial court ultimately erred in admitting H's out-of-court statements. *Id.* at 29–30. Petitioner argues that any such error cannot be deemed harmless, as "[i]t cannot be said beyond a reasonable doubt that the out-of-court statements did not contribute to the verdict." *Id.* at 31. Thus, Petitioner contends that the admission of H's out-of-court statements was "based on an unreasonable determination of the facts in light of the evidence contained in the state court record" and that the state courts' rulings in this case "were contrary to and an unreasonable application" of Petitioner's constitutional rights. *Id.* at 31.

   b.  Response

The State again begins by arguing that Petitioner's argument "does not demonstrate that the state court decisions were contrary to, or an unreasonable application of, clearly established federal law set forth by the Supreme Court" and that Petitioner "does not show that the state court's decisions were based upon an unreasonable determination of facts in light of the record before the state court." [DE 10 at 16]. Moreover, relying upon the federal habeas standard, the State also

25

again points out that federal courts "are generally reluctant to second-guess state evidentiary rulings" and that state evidentiary rulings are subject to harmless error analysis. *Id.* at 17. That being said, the State argues that, "[t]o the extent that [P]etitioner argues the trial court erred by failing to make specific findings regarding the victim's statements, this argument was not preserved for appellate review because [P]etitioner never made such an objection at trial." *Id.* at 17–18.

Next, the State analyzes H's statements to her mother and H's statements during the CPT interview, arguing that such statements were admissible under Florida law. *Id.* at 17–26. More specifically, with respect to H's statements to her mother, the State argues that the trial court "cited and followed the applicable Florida law when it admitted the victim's statements to the mother into evidence." *Id.* at 18. In this regard, at the hearing on Petitioner's motion, the State notes that the mother testified she was "caught off-guard by the victim's spontaneous statement that [P]etitioner pinched the victim's booty and she did not like it" and that she "had no indication that anything was going on and she had not asked any questions about abuse prior to the victim's spontaneous statement." *Id.* at 18–19. Accordingly, the State argues that the trial court properly found that the source of the information had sufficient trustworthiness. *Id.* at 19. Additionally, as to the time, content, and circumstances of the victim's statements to the mother, the State argues that the trial court made specific findings regarding sufficient safeguards of reliability. *Id.* Indeed:

> The victim spontaneously reported [P]etitioner's abuse to her mother one night after taking a shower. . . . The testimony at the evidentiary hearing showed that the victim used child-like terminology when the mother inquired about what the victim was talking about. . . . The victim also physically demonstrated what [P]etitioner did to her. . . . The video of the victim's CPT interview, which the trial court reviewed, established her ability to distinguish fantasy from reality and the truth from a lie. . . . There was no evidence of improper influence on the victim by anyone and neither the victim nor the mother had any motive to fabricate the statements.

*Id.* at 19.

With respect to H's statements during the CPT interview, the State argues that the trial court also "cited and followed the applicable Florida law when it admitted the victim's statements to the CPT into evidence."[7]  *Id.* at 21. Noting that Petitioner indicated the only issue before the trial court during the hearing on child hearsay was the issue of reliability, the State argues that Petitioner abandoned any argument with respect to trustworthiness, and that, in any event, H's CPT testimony was sufficiently trustworthy. *Id.* Moreover, as to the time, content, and circumstances of the out-of-court CPT statements, the State argues that, "[c]ontrary to [P]etitioner's assertions, the record shows the trial court analyzed the specific statements that were introduced because it reviewed the entire CPT video" and that the trial court in fact *did* make specific findings concerning the time, content, and circumstances of the CPT video indicating it had sufficient safeguards of reliability. *Id.* at 22. And, the State argues that H's statements were made "approximately two weeks after the initial disclosure of the abuse, in a child-friendly environment," that "[t]here was no evidence of improper influence on the victim by anyone," that "[P]etitioner's contention that the CPT interviewer influenced the victim's statement completely ignores the fact that she was a six-year-old girl speaking with a stranger about embarrassing and traumatic events," and that "[t]he fact . . . the victim was at times inconsistent or ambiguous with the exact details of the abuse during the CPT interview does not render her statement unreliable." *Id.* at 22–23.

---

[7] In addition to again noting that Petitioner failed to preserve the argument that the trial court failed to make specific findings, the State argues that—to the extent Petitioner claims the trial court "failed to make the findings required under section 90.803(23) because it tasked the State with drafting a proposed order regarding the victim's statement to the CPT"—Petitioner's argument fails under the invited error doctrine, as a party "may not invite error at trial and then be hard to complain of that error on appeal." *Id.* at 20 (quoting *Shingledecker v. State*, 734 So. 2d 483, 484 (Fla. 4th DCA 1999)).

Further, the State argues the trial court's finding that the victim's inconsistencies were attributable to the difficulty of a six-year-old providing a narrative timeline of events is a finding that cannot be reweighed on federal habeas review. *Id.* at 23–24. The State also points out that Petitioner's argument concerning a motive was presented during trial—*after* the trial court had already ruled on the admission of the CPT interview. *Id.* at 24. Additionally, the State notes that Petitioner's statements during a controlled call that he "may have 'accidentally' placed his mouth on the victim's vagina during horseplay" constituted an admission, and that, to the extent Petitioner argued the trial court improperly used his purported admission to bolster the victim's statements, such argument was not preserved for appellate review. *Id.* at 25. And finally, the State distinguishes *Garcia v. State*, 659 So. 2d 388 (Fla. 2d DCA 1995), arguing that in that case, the trial court admitted the out-of-court statements of an older victim with an obvious bias toward the defendant and "did not discuss when the statements were made nor the circumstances under which they were made." *Id.* However, the State argues that "any purported error caused by the trial court's ruling was harmless beyond a reasonable doubt," as Petitioner "admitted to touching and putting his mouth on the victim's vagina during the controlled call the mother made, even if he claimed it was done 'accidentally.'" *Id.* at 26.

c. Reply

Petitioner begins by pointing out that the State "has not disputed the specific facts – which show that the out-of-court statements were not reliable or trustworthy" and instead "merely makes conclusions that the statements met the safeguard requirements." [DE 17 at 7]. Indeed, with respect to Petitioner's argument about the CPT interview and about how H was pressured, Petitioner notes that the state trial court never addressed H being pressured by the interviewer nor the interviewer's

inference that H was calling her mother a liar. *Id.* Moreover, with respect to the time at which H's statements were made to her mother, Petitioner argues that "the dates of the alleged abuse were never determined" and that H's delay in disclosing "goes against reliability and trustworthiness." *Id.* at 8. Further, as to the spontaneity of H's statements during the CPT interview, Petitioner argues that the CPT interview "was a pressured interview and was the opposite of a spontaneous statement." *Id.*

Next, while Petitioner notes the State merely argues that children by their very nature give inconsistent statements, Petitioner argues that the inconsistencies were important and showed a lack of reliability. *Id.* Petitioner also points out that the State does not analyze the children's mental state and argues that, "if there is [no] indication of when the alleged abuse occurred, it is difficult to determine whether there was or was not a possible motive." *Id.* at 8–9. Finally, Petitioner argues that the fact the children ultimately testified does not render any error harmless because "the fact that they would be witnesses does not make their out-of-court statements reliable or admissible" and "H's lack of cooperation as a witness did not render effective cross-examination."[8] *Id.*

   d.  <u>Legal Standard & Analysis</u>

Under section 90.803(23), Florida Statutes (2016):

> (a) Unless the source of information or the method or circumstances by which the statement is reported indicates a lack of trustworthiness, an out-of-court statement made by a child victim with a physical, mental, emotional, or developmental age of 16 or less describing any act of child abuse or neglect, any act of sexual abuse against a child, the offense of child abuse, the offense of aggravated child abuse, or any offense involving an unlawful sexual act, contact, intrusion, or penetration performed in the presence of, with, by, or on the declarant child, not otherwise admissible, is admissible in evidence in any civil or criminal proceeding if:

---

[8] Despite Petitioner at times referring to both children, Ground Two specifically deals with *H*'s out-of-court statements, and Petitioner argues that "the state trial court erred by admitting out-of-court statements of H." *Id.* at 31.

1. The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. In making its determination, the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate; and

2. The child either:

a. Testifies; or

b. Is unavailable as a witness, provided that there is other corroborative evidence of the abuse or offense. Unavailability shall include a finding by the court that the child's participation in the trial or proceeding would result in a substantial likelihood of severe emotional or mental harm, in addition to findings pursuant to s. 90.804(1).

(b) In a criminal action, the defendant shall be notified no later than 10 days before trial that a statement which qualifies as a hearsay exception pursuant to this subsection will be offered as evidence at trial. The notice shall include a written statement of the content of the child's statement, the time at which the statement was made, the circumstances surrounding the statement which indicate its reliability, and such other particulars as necessary to provide full disclosure of the statement.

(c) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this subsection.

§ 90.803(23), Fla. Stat. (2016). "For a hearsay statement to be admitted under this section, the statement must meet two specific reliability requirements: (1) the *source* of the information through which the statement was reported *must indicate trustworthiness*; and (2) the *time, content, and circumstances* of the statement must reflect that the statement *provides sufficient safeguards of reliability*." *State v. Townsend*, 635 So. 2d 949, 954 (Fla. 1994). "[I]t is essential that the trustworthiness and reliability requirements of section 90.803(23) be strictly followed," as "the

reliability determination as to the admissibility of hearsay evidence is critical to the protection of

an accused's rights under the confrontation clause." *Id.* at 957.

Notably, the "other factor[s]" referenced in section 90.803(23)(a)1.:

> may include, but are not limited to, a consideration of the statement's spontaneity; whether the statement was made at the first available opportunity following the alleged incident; whether the statement was elicited in response to questions from adults; the mental state of the child when the abuse was reported; whether the statement consisted of a child-like description of the act; whether the child used terminology unexpected of a child of similar age; the motive or lack thereof to fabricate the statement; the ability of the child to distinguish between reality and fantasy; the vagueness of the accusations; the possibility of any improper influence on the child by participants involved in a domestic dispute; and contradictions in the accusation.

*Id.* at 957–58. "Failure to make specific findings not only ignores the clear directive of the statute,

but also implicates the defendant's right to confrontation." *Hopkins v. State*, 632 So. 2d 1372, 1377

(Fla. 1994). In this regard, "[a] mere conclusion that a child's statements are reliable or a mere

restatement of the statute in a boilerplate fashion is insufficient to meet the requirements of the

confrontation clause." *Townsend*, 635 So. 2d at 957.

Here, the State sought to introduce H's out-of-court statements made to her mother and to

a CPT interviewer. *See* DE 10-2 at 168. As to the former, on May 24, 2017, the trial court heard

argument on the admission of H's out-of-court statements to her mother. [DE 11-2 at 1–46].

Following that hearing, on June 2, 2017, the trial court entered an Order Regarding Admission of

Child Hearsay Evidence.[9]  Specifically, the trial court found H and her mother (who testified at the

hearing) to be trustworthy and credible. The trial court also found that: (1) H's statements to her

---

[9] Frustratingly, the State did not include the Order Regarding Admission of Child Hearsay Evidence as an exhibit. Nonetheless, the Court has independently reviewed that Order in the underlying criminal case file. The Order was entered on June 2, 2017, and is available on the Palm Beach County docket as DE 197.

mother were spontaneous, as H "was the first to mention the incident to her mother" and the mother had no prior knowledge of any abuse; (2) there was no evidence of any improper influence on H; and (3) H had no motive to fabricate the statements. Accordingly, the trial court found H's statements reliable. In making this finding, the trial court noted that the out-of-court statements to H's mother were also reliable because Petitioner made statements admitting to conduct that was consistent with the charged offense and because H was available to testify at trial.[10]

Thereafter, on October 2, 2017, the trial court heard argument as to the admission of H's out-of-court statements made during her CPT interview. [DE 1102 at 121–76]. Following that second child hearsay hearing, on October 3, 2017, the trial court entered an Order Regarding State's Second Notice of Intent to Offer Child Hearsay-CPT Interviews. [DE 10-2 at 168–72]. Specifically, the trial court found H's statements made during her CPT interview to be trustworthy and reliable, as: (1) H was able to distinguish between the truth and a lie; (2) her descriptions were child-like; (3) Petitioner was well-known to H; (4) H was able to provide narrative responses detailing the abuse; and (5) H's statements at the CPT interview were made within two weeks of her initial disclosure and were made in a child-friendly environment. *Id.* at 171–72. Moreover, with respect to the inconsistencies in H's CPT statement, the trial court found that the inconsistencies did not "undermine the witness's reliability but . . . [were instead] attributable to those inconsistencies [that] could also be reasonably attributed to a six-year old['s] difficulty with providing a narrative timeline of events." *Id.* at 172.

The court also found that any argument as to the inconsistencies in H's CPT statement went to the weight and not the admissibility of such. Further, the trial court found that H had no reason

---

[10] This information is taken from pages 4 and 5 of the June 2, 2017 Order.

to fabricate her statement and that H's statement was sufficiently reliable and trustworthy. *Id.* And finally, the trial court again noted that H's out-of-court statements were also reliable because Petitioner had made statements admitting to conduct that was consistent with the charged offense and because H was available to testify at trial. *Id.* at 172.

First, to the extent that Petitioner now argues that the trial court's usage of an Order provided by the State violated his constitutional rights, that argument was never raised before the trial court and is therefore not preserved for review. Second, as to H's out-of-court statements made to her mother, the trial court made sufficient findings as to the trustworthiness, and the time, content, and circumstances of the statements. Indeed, as to trustworthiness, the trial court found H's mother credible and therefore found credible the testimony that H's mother had no knowledge of any prior abuse and that H had spontaneously reported being touched. While Petitioner takes issue with the timing of the purported abuse never being determined—and with H being unable to point to the timing of the specific charged conduct (such as Petitioner licking her tooshie)—it was H's actions in reporting that Petitioner had pinched her bootie that led H to discuss other incidents of touching (for which there were apparently many, based upon H's testimony at trial that Petitioner had touched her in "all of the[]" rooms in the house). [DE 11-1 at 547]. Thus, this was not a situation in which H needed to point to any one single incident. Additionally, as to the content and circumstances of H's statements to her mother, the court noted that there was no evidence of improper influence and that H had no motive to fabricate the statements. While a motive to lie may have surfaced at trial, that motive was not presented prior to trial.

Third, as to H's out-of-court statements made during the CPT interview, the trial court also made sufficient findings as to the trustworthiness, and the time, content, and circumstances of the

statements. In this regard, during the October 2, 2017 hearing, defense counsel admitted that only reliability (and not trustworthiness) was at issue. [DE 11-11 at 127]. As to the timing of H's statements, the trial court noted that the statements were made within two weeks of H's initial disclosure to her mother. And, as to the content and circumstances, the trial court found that H was able to distinguish between the truth and a lie, that H's descriptions were child-like, that Petitioner was well-known to H, and that H was able to provide narrative responses detailing the abuse. Although H's statements during the CPT interview were inconsistent (and also inconsistent with H's other out-of-court statements), the trial court properly found such inconsistencies attributable to a six-year-old having difficulty narrating a timeline of events. The trial court also again found that H had no motive to lie (as no motive was even presented prior to trial).

Nonetheless, it does appear arguable that the trial court improperly found H's out-of-court statements to be reliable, at least in part, due to corroborating evidence. *See Townsend*, 635 So. 2d at 956 ("Although section 90.803(a)(2)b. does require that other corroborating evidence must exist before hearsay evidence can be admitted, *this requirement is in addition to the requirement that the hearsay evidence, in and of itself, must be reliable*."). However, any error in stating such—and any potential error in the trial court's findings under *Townsend*—are harmless beyond a reasonable doubt. This is because H *actually testified* at trial (which, as noted *supra*, was not error), and because (as also noted *supra*), Petitioner's statements during the controlled call that he may have "accidentally" put his mouth on H's "tooshie" (vagina) lead to the inescapable conclusion that any purported error was harmless beyond a reasonable doubt.

Further, while Petitioner cites heavily to *Garcia v. State*, 659 So. 2d 388 (Fla. 2d DCA 1995), that case is distinguishable. In that case, "the trial court's determinations based on the

statutory criteria of the child's mental maturity and reliability, as well as the reliability of her assertions, were factually insufficient to satisfy the requirements of the statute." *Id.* at 393. Moreover, in that case, "the child's testimony constituted the only evidence against" the defendant. *Id.* Here, however, the trial court's findings constituted more than a conclusory recitation of the statute. And, this was not a case in which there was no other evidence against Petitioner, as his very own statements during the controlled call seemed to heavily support H's testimony.

Accordingly, Petitioner has failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, or that such rejection is based on an unreasonable determination of facts. The Undersigned United States Magistrate Judge therefore **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground Two.

### iii.   Ground Three: The state trial court erred in overruling Petitioner's objection to the mother's testimony that she was in fear for her and her children's safety due to Petitioner.

#### a.   Petition

Petitioner next argues that the trial court reversibly erred in overring his objection that H's mother was in fear both for herself and the safety of her children due to Petitioner, which Petitioner contends denied "his rights to due process and a fair trial." [DE 1 at 31]. According to Petitioner, "[t]he State gave no justification for the admission of the mother's fear that Petitioner . . . was a danger to her and her children. Nor did the state trial court give a basis for overruling the objection." *Id.* In this regard, because Petitioner maintains that the mother's state of mind was not relevant to the charges, Petitioner argues the trial court's actions in overruling his objection was "based on an unreasonable determination of the facts in light of the evidence contained in the state

court record" and that the erroneous ruling was "contrary to and an unreasonable application" of Petitioner's constitutional rights. *Id.* at 33.

Further, because "[t]he mother's fear for the safety of her and her children from Petitioner . . . was extremely prejudicial," Petitioner argues that it "cannot be said beyond a reasonable doubt that such prejudicial testimony could not have influenced the jury." *Id.* Petitioner thus argues that the error was not harmless. *Id.*

    b.  Response

The State argues that Petitioner's opening statement attacked the mother's credibility, and that, "[c]ontrary to [P]etitioner's assertion, the mother's testimony [that she was afraid Petitioner was going to come after her or children] was relevant to the issue of her credibility." [DE 10 at 27]. According to the State, "[u]nder the circumstances in this case, the State simply asked the mother a question to rebut the false impression [P]etitioner presented to the jury during opening statements." *Id.* at 28. Moreover, the State argues that "any purported error caused by the mother's testimony was harmless beyond a reasonable doubt." *Id.*

    c.  Reply

Petitioner again argues that "the mother's state of mind of being in fear of Petitioner . . . was not relevant to the charges." [DE 17 at 10]. In any event, Petitioner maintains that the mother's testimony was "extremely" prejudicial. *Id.* at 10.

    d.  Legal Standard & Analysis

"Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. "All relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. However, "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by

the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. "Evidence which demonstrates that a witness was threatened or in fear for his [or her] life is irrelevant and inadmissible if the prosecution cannot link the threats to the defendant." *Morgan v. State*, 603 So. 2d 619, 620 (Fla. 3d DCA 1992). "Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence." *Occhicone v. State*, 570 So. 2d 902, 904 (Fla. 1990). However, defense counsel's comments during opening argument may invite the State to inquire as to certain related matters. *Morgan*, 603 So. 2d at 620.

In *Morgan*, a defendant was charged with one count of first degree murder, two counts of attempted first degree murder, and shooting a deadly missile into an occupied dwelling. *Morgan*, 603 So. 2d at 619 n.1. At trial, during defense counsel's opening statement, defense counsel attacked one of the victims' credibility "by arguing that it took him about one year to identify the defendant as being involved in the shooting." *Id.* at 620. And, over defense counsel's objection, that same victim "was permitted to testify that he was afraid that he would be killed if he testified against the defendant." *Id.* Defense counsel then moved for a mistrial, "arguing that there was no evidence that the defendant had ever threatened" the victim. *Id.* The trial court denied the motion for mistrial. *Id.*

On appeal, the defendant "argue[d] that the trial court erred in denying his motion for mistrial where the prosecution, over objection, elicited from [the victim] that the reason that he did not immediately come forward and identify the defendant as being involved in the shooting was because he was afraid that he would be killed if he testified against the defendant." *Id.* Ultimately, noting that "[e]vidence which demonstrates that a witness was threatened or in fear for his life is

irrelevant and inadmissible *if the prosecution cannot link the threats to the defendant*," the appellate court held that the trial court did not err in denying the defendant's motion for mistrial. *Id.* (emphasis added). This was because, "during opening statement the defense counsel attacked [the victim's] credibility by arguing that he fled and did not immediately come forward to give the police a statement," which the appellate court stated "invited the State's inquiry as to why [the victim] left town and did not immediately come forward." *Id.*

In the instant case, during defense counsel's opening statement, defense counsel noted that the mother did not report the incident for two days and asserted that the mother continued to speak with Petitioner in the time between when she reported the incident and when she participated in a controlled and recorded telephone call with Petitioner. [DE 11-1 at 454]. Moreover, defense counsel noted that the mother left behind lingerie for Petitioner to find with the words "remember me" on it, and stated that the mother would testify she only kept in contact with Petitioner and did these things because the officers told her she should "play nice" with Petitioner to get a confession out of him. *Id.* However, defense counsel argued that the responding officers in this case would testify that they never told the mother any such thing, and that the mother would testify that the reason she reported the incident to the police in the first instance was because she was afraid her ex-husband would get custody of the kids forever if she did not. *Id.* at 454–55.

Subsequently, when the mother was called to testify, the State questioned the mother concerning the circumstances of the controlled call and asked if the mother was concerned what would happen if Petitioner knew she contacted the police. *Id.* at 634–35. When the mother stated she was "absolutely" concerned and the State inquired on this matter, defense counsel objected based on relevancy. *Id.* at 635. The trial court overruled such objection, and the mother then

testified that she was concerned about the safety of herself and her children because of her actions in "making these allegations and then going to the police and everything." *Id.*

In other words, in response to defense counsel's opening argument that the reason the mother reported the incident was because she was afraid her ex-husband would get custody of the kids, the State elicited testimony that the mother—rather than being concerned about her ex-husband getting custody—was concerned about the safety of herself and her children and reported Petitioner to the authorities and attempted to get Petitioner to confess in a controlled call despite this fear. Additionally, in response to defense counsel's statement that the officers never told the mother to "play nice" with Petitioner, the State elicited testimony from the mother that she continued to speak with Petitioner to try to coerce a confession out of him. Thus, the instant case presents a scenario analogous to *Morgan*. As in *Morgan*, the State elicited testimony to help aid in the jury's credibility determination with respect to the mother and to counter statements made in opening argument. *See also Williamson v. State*, 681 So. 2d 688, 695 (Fla. 1996) (holding that testimony relevant to a witness' credibility may be admissible to establish why the witness was in fear).

Petitioner cites *Selver v. State*, 568 So. 2d 1331 (Fla. 4th DCA 1990), for the proposition that a victim's fear that a defendant may intend to kill them is generally inadmissible. However, that case dealt with statements of fear . . . [that were] only remotely relevant and did "not describe the victim's state of mind." *Id.* at 1334. Instead, the statements of fear were "for the admission of the facts of [a] drug transaction between the victim and the appellant which would otherwise be inadmissible." *Id.* Here, unlike in *Selver*, the State was not eliciting testimony from the mother to

establish any facts, but rather to respond to statements made in defense counsel's opening argument that called the mother's credibility into question.

In any event, even assuming there *had* been error in the trial court's ruling (and the Undersigned does not believe there was), any error was harmless beyond a reasonable doubt. On redirect examination, the mother was asked if she also told Petitioner's sister-in-law that she was "afraid that [Petitioner] would get out and do something" to her and the children. [DE 11-1 at 730]. Without objection, the mother responded "Yes" and noted that she did not want Petitioner to get out on bond or bail. *Id.* Further, during closing argument, the State again focused on this testimony, arguing (without objection):

> They want you to focus on how [the mother] decides to keep talking to him. And you'll get to review the text messages. They're innocuous. "How are you doing today?" "I need some more time to think about what's going on." Those types of things. Use your commonsense regardless of what police officers told her, *she doesn't want the Defendant to know that she's contacting the police because she's scared for her safety if he knows; she's scared for her children's safety*. He knows her whole family; he knows where she moved to. Commonsense.
>
> And she tells [Petitioner's sister-in-law] that. *Remember on redirect examination "did you also tell [Petitioner's sister-in-law] that you were scared that he would come out and get -- come after you; is that another text that you sent her that same day?" "Yes."* And the Defense wants you to say that the testimony is that the deputies never told her.

*Id.* at 1249–1250 (emphasis added).

Accordingly, Petitioner has failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, or that such rejection is based on an unreasonable determination of facts. The Undersigned United States Magistrate Judge therefore **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground Three.

**iv.**    <u>**Ground Four: The state trial court erred in granting the State's cause challenge**</u>

    a.  <u>Petition</u>

Petitioner argues that the state trial court erred in "grant[ing] the State's cause challenge on prospective juror Horrobin on the ground that he would require more than one witness in order to vote guilty," which Petitioner contends denied him his "constitutional right to due process, a fair trial, and a properly-selected jury." [DE 1 at 32–33]. Petitioner maintains that "contrary to the State's representations, Mr. Horrobin indicated that guilt could be proven with one witness." *Id.* at 33. Thus, Petitioner argues "Mr. Horrobin's fairness and impartiality made him a competent juror under Florida law." *Id.* at 34. And, because "[a] trial court's erroneous ruling on the State's cause challenge is not subject to harmless error review," Petitioner contends that he was "denied his constitutional right to a fair trial and right to a properly-selected jury (i.e., the state courts' rulings in this case were contrary to and an unreasonable application of Petitioner['s] . . . constitutional rights)" and that the state court's ruling was "based on an unreasonable determination of the facts in light of the evidence contained in the state court record." *Id.* at 35.

    b.  <u>Response</u>

The State begins by arguing that Petitioner's claim was not preserved for appellate review, as Petitioner "did not object when the trial court struck Mr. Horrobin." [DE 10 at 28–29]. Nonetheless, the State argues that Petitioner "essentially asks this Court to re-interpret Mr. Horrobin's statements during voir dire to reach a conclusion more favorable to him, i.e., there was no reasonable doubt concerning Mr. Horrobin's ability to follow the law as a juror in this case." *Id.* at 29. According to the State, "Mr. Horrobin's statements during voir dire that something more than a witness's testimony was necessary to prove a case beyond a reasonable doubt was more

than enough for the trial court to find that a reasonable doubt existed as to whether Mr. Horrobin could follow the law." *Id.* at 29–30.

Thereafter, the State argues that Petitioner's reliance upon *Ault v. State*, 886 So. 2d 674 (Fla. 2003), is misplaced, as "the defendant in that case asked for an opportunity to rehabilitate a prospective juror the State wanted to discharge for cause, but the trial court would not allow him to do so." *Id.* at 30. In any event, the State argues that any purported error is harmless beyond a reasonable doubt because Petitioner "has not shown he was deprived of a trial by a fair and impartial jury." *Id.*

c.   Reply

Petitioner mainly responds to the State's preservation argument. *See* DE 17 at 10–11. To this end, Petitioner argues that "magic words" are not needed to preserve an issue for appellate review, and that "the question is whether the judge understood the objection and had the chance to correct the error." *Id.* at 10. Moreover, Petitioner notes that counsel renewed the objection and "only accepted the jury panel subject to [Petitioner's] prior objections." *Id.* at 11. And again, as to the merits, Petitioner argues that Mr. Horrobin "indicated that guilt could be proven with one witness." *Id.*

d.   Legal Standard & Analysis

"The test for determining juror competency is whether a juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." *Ault v. State*, 866 So. 2d 674, 683 (Fla. 2003). Pursuant to section 913.03, Florida Statutes, "[a] challenge for cause to an individual juror may be made . . . [if t]he juror has a state of mind regarding the defendant, the case, the person alleged to have been injured by the

42

offense charged, or the person on whose complaint the prosecution was instituted that will prevent the juror from acting with impartiality." § 913.03(10), Fla. Stat. "A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." *Johnson v. State*, 969 So. 2d 938, 946 (Fla. 2007) (quoting *Ault*, 866 So. 2d at 683).

Here, the following exchange took place during voir dire:

| [THE STATE]: | All right. Uhm, if we can hand the microphone back to Mr. Cruz. What do you think about that; one witness is called hypothetically, you believe that witness beyond a reasonable doubt, are you able to make a finding of guilt? |
|---|---|
| PROSPECTIVE JUROR CRUZ: | Yes, I do. |
| [THE STATE]: | Okay, thank you. If you could hand it to your left. Ms. Beyers, what do you think? |
| PROSPECTIVE JUROR BEYERS: | Uhm, I agree. I think it's based on -- I think it's more qualitative – |
| [THE STATE]: | Okay. |
| PROSPECTIVE JUROR BEYERS: | -- versus quantitative. |
| [THE STATE]: | All right. If you could hand it to Mr. Horrobin. Go ahead. |
| PROSPECTIVE JUROR HORROBIN: | Yeah, I also feel more than one witness is not a requirement for proving beyond a reasonable doubt. If you say you will prove beyond a reasonable doubt, that means it's more than just words. There's something other than that one witness's testimony. |
| [THE STATE]: | Okay. |

43

PROSPECTIVE JUROR HORROBIN:      But uh -- proving beyond a reasonable doubt is possible with one witness.

[DE 11-1 at 253]. Subsequently, during the for-cause challenges, the following exchange took place:

[THE STATE]:      Uhm, the next one that the State would have would be 4-4 [Prospective Juror Horrobin]. The basis for 4-4 is that he indicated to [the State] that he would require more than one witness, that one witness would be insufficient. He was more -- he needed more than just words and more than just testimony in order to uhm --

THE COURT:      Defense?

[DEFENSE]:      I would say the same thing about the last juror we discussed on that. He -- Mr. Horrobin never indicated that he would do anything short of following the law on any topic even though that was his preference --

THE COURT:      Right, but he --

[DEFENSE]:      -- that he would like more.

THE COURT:      -- did say that he would need more than one witness where multiple times instructed them and gave them a hypothetical during my jury selection that if the State calls one witness and you believe they proved their case beyond a reasonable doubt. So 4-4 is out for cause; reasonable doubt as to whether he can follow the law. Next.

*Id.* at 392–93. Thus, the trial court granted the State's cause challenge, noting that Mr. Horrobin stated he would need more than one witness for the State to prove their case beyond a reasonable doubt.

Notwithstanding preservation issues and defense counsel's failure to challenge the trial court's ruling at that time—despite Petitioner ultimately renewing his objections about "one

44

witness being enough," *id.* at 407—Mr. Horrobin, in essence, stated that he would need something *more* than witness testimony for the State to prove their case beyond a reasonable doubt. As stated by Mr. Horrobin: "If you say you will prove beyond a reasonable doubt, that means it's more than just words. There's something other than that one witness's testimony." *Id.* at 253. Mr. Horrobin's statement came after extensive questioning by the State about whether there was anyone that believed "if you hear from a witness and you find that person credible beyond a reasonable doubt, would you still not believe that person if there was nothing else to corroborate what he or she was saying?" (for which Mr. Horrobin did not speak up). *Id.* at 246. Consequently, despite Petitioner's argument, it was clear that Mr. Horrobin required something more than one witness—that is, something other than a second witness, such as some sort of corroborative evidence—for the State to prove its case beyond a reasonable doubt, and that Mr. Horrobin could not properly follow the applicable law. The trial court therefore did not err in granting the State's cause challenge.

Petitioner relies heavily on *Ault v. State*, 886 So. 2d 674 (Fla. 2003), to argue that the trial court's ruling is not subject to a harmless error analysis. However, as the Court finds that the trial court did not err, no harmless error analysis is necessary. Moreover, Petitioner has failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, or that such rejection is based on an unreasonable determination of facts. The Undersigned United States Magistrate Judge therefore **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground Four.

     **v.**    **<u>Ground Five: The state trial court erred in allowing the State expert to testify to profiles of pedophiles and how children acted in other cases.</u>**

    a.  <u>Petition</u>

As Petitioner's fifth claim, Petitioner argues that State expert Dr. Rapa's testimony concerning "profiles of pedophiles and specifically how they 'groom' children in order to victimize them and regarding how victims acted in other cases" constituted a denial of Petitioner's "rights to due process and a fair trial." *Id.* More specifically, despite the State's argument that Dr. Rapa was "totally unaware of any of the facts of th[e] case, and was testifying to general facts regarding pedophilia and victims," Petitioner contends that "these generalizations are . . . error" and that the error is harmful. *Id.* Relying on *Turtle v. State*, 600 So. 2d 1214 (Fla. 1st DCA 1992), Petitioner argues that it is reversible error for the State "to present testimony of an expert to give *general testimony* regarding pedophilia by an expert who never examined the defendant." *Id.* Indeed, Petitioner represents that "in this case, not only did the State elicit . . . [harmful] pedophilia profile grooming evidence, but the State presented other testimony that would help support that Petitioner . . . would fit the profile evidence in this case." *Id.* at 37.

Additionally, Petitioner argues that Dr. Rapa's testimony "as to the characteristics of victims, including that there are some inconsistencies because of delays in reporting the abuse and that they slowly – over time – give the details of the abuse" was improper. *Id.* Petitioner argues that this testimony "amounted to a comment on the reliability of the victim." *Id.* at 37. Therefore, Petitioner contends that the state trial court allowing Dr. Rapa's testimony (over objection) constituted an "unreasonable determination of the facts in light of the evidence contained in the state court record" and that the state courts' ruling with respect to Dr. Rapa was "contrary to and an unreasonable application" of Petitioner's constitutional rights. *Id.* at 38.

b. <u>Response</u>

The State once more begins by arguing that Petitioner's argument "does not demonstrate that the state court decisions were contrary to, or an unreasonable application of, clearly established federal law set forth by the Supreme Court" and that Petitioner "does not show that the state court's decisions were based upon an unreasonable determination of facts in light of the record before the state court." [DE 10 at 31]. And again, relying upon the federal habeas standard, the State points out that federal courts "are generally reluctant to second-guess state evidentiary rulings" and that state evidentiary rulings are subject to harmless error analysis. *Id.*

That being said, it is the State's position that Dr. Rapa never testified about "pedophile profiles" at trial and that instead, Dr. Rapa's testimony "focused on how a child's memory works and how children react to and disclose sexual abuse perpetrated by someone known to them." *Id.* As argued by the State, "Dr. Rapa's testimony was a direct rebuttal to [P]etitioner's assertion in opening and throughout the trial that the victim's disclosure of different incidents at different times was evidence that the accusations were false." *Id.* at 31–32. Further, relying upon *Torres v. State*, 999 So. 2d 1077 (Fla. 4th DCA 2009)—and a number of other cases—the State argues that Dr. Rapa's testimony "concerning the concept of 'grooming' was admissible in this case." *Id.* at 32–33. In this regard, the State distinguishes Petitioner's citation to *Turtle v. State*, 600 So. 2d 1214 (Fla. 1st DCA 1992), arguing that Petitioner's reliance on that case is misplaced "because the expert in that case described the characteristics of a pedophile and the State in closing asked the jury to convict the defendant because he fit a pedophile profile," whereas in the instant case, the State contends that Dr. Rapa did not testify about a pedophile profile and did not argue such. *Id.* at 33–34. In any event, the State argues that any error "would be harmless beyond a reasonable

doubt because there is no reasonable possibility that the purported error contributed to the conviction." *Id.* at 34.

c.   Reply

Despite the State's argument that Dr. Rapa did not testify as to a "pedophile profile," Petitioner argues that "in testifying regarding grooming and other behavior of pedophiles, Dr. Rapa was testifying to profiles – [s]he testified to profiles of pedophiles and specifically how they 'groom' children in order to victimize them, and testified regarding how victims acted in other cases." [DE 17 at 11]. Indeed, Petitioner again points out that Dr. Rapa's testimony—which "was *not* in regard to the facts of this case but instead was in regard to general facts regarding pedophilia and victims"—is error. *Id.* at 11–12.

d.   Legal Standard & Analysis

It is reversible error for the trial court to allow "the [S]tate to introduce 'pedophile profile' testimony as substantive evidence of [a] defendant's guilt." *See Turtle v. State*, 600 So. 2d 1214, 1220 (Fla. 1st DCA 1992). However, "expert testimony concerning the behaviors of child molestation victims based entirely on the expert's professional experience" may be admissible.[11] *Torres v. State*, 999 So. 2d 1077, 1078 (Fla. 4th DCA 2009). While an expert "may not directly

---

[11] The court in *Torres* stated that such testimony was admissible as "pure opinion." *Torres*, 999 So. 2d at 1078. "In 2013, the legislature amended section 90.702 with the intention of adopting 'the standards for expert testimony in the courts of this state as provided in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).'" *R.C. v. State*, 192 So. 3d 606, 609 (Fla. 2d DCA 2016). "[B]y adopting *Daubert*, the legislature made it clear that 'pure opinion testimony,' i.e. testimony based only on the personal experience and training of the expert, is no longer admissible." *Id.* However, there is no *per se* prohibition on pure opinion testimony. *United Auto. Ins. Co. v. Progressive Rehab. & Orthopedic Servs., LLC*, 324 So. 3d 1006, 1010 (Fla. 3d DC 2021). Rather, the Florida legislature "simply brought Florida in line with the federal Daubert standard, which requires all expert testimony, including experience-based testimony, to satisfy Daubert's reliability inquiry." *Id.*

testify as to the truthfulness of the victim in a child sexual abuse case," testimony about "observations from . . . experience regarding behaviors of child sex abuse victims . . . [may be] admissible 'to properly aid a jury in assessing the veracity of a victim of child sexual abuse.'" *Oliver v. State*, 977 So. 2d 673, 677 (Fla. 5th DCA 2008) (quoting *Russ v. State*, 934 So. 2d 527, 530–31 (Fla. 3d DCA 2006)). To this end, "an expert may properly aid a jury in assessing the veracity of a victim of child sexual abuse." *Tingle v. State*, 536 So. 2d 202, 205 (Fla. 1988).

In the instant case, when the State asked Dr. Rapa if she had experience "with evaluating sex offenders individuals who commit sex crimes," and when the State asked Dr. Rapa to define the term "grooming," defense counsel objected on relevancy grounds and the trial court overruled those objections. [DE 11-1 at 883–891]. In the Petition, Petitioner now asserts that Dr. Rapa's testimony "to general facts regarding pedophilia and victims" is harmful error based upon *Turtle*. [DE 1 at 35]. Petitioner also asserts that Dr. Rapa's testimony "as to the characteristics of victims, including that there are some inconsistencies because of delays in reporting the abuse and that they slowly – over time – give details of the abuse" is improper based upon *Williams v. State*, 619 So. 2d 1044 (Fla. 4th DCA 1993). Petitioner's argument is without merit.

In *Turtle v. State*, 600 So. 2d 1214 (Fla. 1st DCA 1992), the appellate court—relying upon *Phillips v. State*, 589 So. 2d 1360 (Fla. 1st DCA 1991)—reversed and remanded based upon the prosecution's actions in essentially asking the jury to convict a defendant based on the defendant fitting a "pedophile profile." *Turtle*, 600 So. 2d at 1221. This was because the State specifically elicited testimony from other witnesses that inherently linked the expert's testimony regarding a "pedophile profile" to the defendant. *Id.* Moreover, during closing argument, the State focused on the defendant's actions being consistent with a "pedophile profile." *Id.*

Here, in contrast, the State made no attempt to link Petitioner to the hypothetical pedophile described by Dr. Rapa. While Dr. Rapa testified that a pedophile will typically "try[] to form a special relationship with [a] child," DE 22-1 at 382, and while Petitioner cites to pages 606 and 607 of the transcript as an example of testimony that would "help support that Petitioner . . . would fit the profile evidence in this case," DE 1 at 37, those pages merely demonstrate that Petitioner spent time with the children and that the mother trusted Petitioner with her children. *See* DE 11-1 at 606–07. Such testimony helped establish that the children had a good relationship with Petitioner and was a direct response to testimony from the minor male victim (H's brother) that he was "a little" upset that his mother no longer played with him as much as she used to because of Petitioner—testimony which could have inferred a motive for fabricating allegations against Petitioner. [DE 11-1 at 487].

Further, to the extent that Petitioner relies upon *Williams* for the proposition that Dr. Rapa's testimony "as to the characteristics of victims" was improper, such an argument is directly refuted by both *Oliver* and *Torres*. In *Oliver,* "the expert explained how victims typically deny the sexual abuse at first, delay disclosure, and ultimately disclose information in a piecemeal fashion," limiting his testimony to his own professional experience. *Torres*, 999 So. 2d at 1078. *Torres*, in turn, involved an expert that "did not rely on scientific studies, syndrome evidence, diagnostic criteria, or any other classic scientific test" and instead "limited the basis for his testimony to his own professional experience." *Id.* at 1079. In both circumstances (and cases), the Fifth and Fourth District Courts of Appeal, respectively, found such testimony permissible. *Id.* at 1078–79.

Here, Dr. Rapa's testimony about a child's memory and how a child reacts to sexual abuse directly refuted defense counsel's argument about the inconsistencies in the children's statements

and the testimony elicited to demonstrate such. While Petitioner relies upon *Williams*, that case is entirely inapposite. In *Williams*, the appellate court considered whether a deputy "improper[ly] comment[ed] on the reliability of eyewitness identification." *Williams*, 619 So. 2d at 1046. The instant case, however, involves an *expert's* testimony concerning child sexual abuse victims, and the Florida Supreme Court has explicitly acknowledged that "an expert may properly aid a jury in assessing the veracity of a victim of child sexual abuse," despite acknowledging that "expert testimony [concerning child sexual abuse victims], by its very nature, to some degree will tend to either bolster or refute the credibility of the child victim." *Tingle*, 536 So. 2d at 205. Indeed, an expert's observations from his experience regarding behaviors of child sex abuse victims is "admissible to rebut defense on the victims' credibility." *Oliver*, 977 So. 2d at 677 (citing *Russ v. State*, 934 So. 2d 527. 530–31 (Fla. 3d DCA 2006)).

While it is certainly true that pure opinion testimony has been limited in the years since *Oliver* and *Torres* were decided, pure opinion testimony is still admissible so long as it satisfies *Daubert's* reliability inquiry. *See United Auto Ins. Co.*, 324 So. 3d at 1010. Here, Petitioner makes no attempt to argue that Dr. Rapa's testimony fails to satisfy *Daubert's* reliability inquiry. In fact, Petitioner does not even acknowledge the State's citation to *Oliver* or *Torres*.

Accordingly, Petitioner has failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, or that such rejection is based on an unreasonable determination of facts. The Undersigned United States Magistrate Judge therefore **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground Five.

### vi.   Ground Six: The state trial court erred in failing to hold a *Richardson* inquiry where the State failed to list Katharine Muehlberg as an expert.

a.   <u>Petition</u>

Petitioner argues that the State's failure to list Ms. Muehlberg as an expert denied Petitioner his "rights to due process and a fair trial." [DE 1 at 38]. According to Petitioner, "[a] key issue in this case was the credibility of H and her delay in disclosing the allegations. A recording of her interview with CPT was published to the jury. In order to fortify its position that it was normal for children to be embarrassed and thus delay in disclosing information, the State elicited this information from its witness Katharine Muehlberg." *Id.* Because the State failed to list Ms. Muehlberg as an expert—and because Ms. Muehlberg's testimony elicited "facts of which the layman is not aware"—Petitioner argues that the State's failure to list Ms. Muehlerg as an expert constituted a discovery violation and that the trial court should have conducted a *Richardson* inquiry. *Id.* at 38–39. In this regard, Petitioner argues that "[a] judge's failure to conduct a proper *Richardson* hearing is *per se* error." *Id.* at 39.

More specifically, Petitioner notes that Ms. Muehlberg was expected to testify as a fact witness, and that the State's usage of "her experience in other cases to testify that it was normal for children to be embarrassed and thus delay in disclosing information" led to procedural prejudice that was "apparent on the face of th[e] record." *Id.* at 40–41. Indeed, Petitioner argues that had he "been aware the State would be using the witness' expertise, he might have called his own experts to testify. In addition, with advance notice, the defense could have investigated the witness' purported expertise and perhaps challenged it." *Id.* at 41. Thus, according to Petitioner, "[b]ecause defense counsel could have done other things with the evidence proves that there was procedural prejudice and that the error was not harmless." *Id.* at 41–42. Petitioner therefore argues

that the failure to conduct a *Richardson* inquiry constituted an "unreasonable determination of the facts in light of the evidence contained in the state court record" and that the state court's erroneous ruling was "contrary to and an unreasonable application" of Petitioner's constitutional rights. *Id.* at 42.

b.   Response

The State argues that the trial court properly admitted Ms. Muehlberg's testimony "that when interviewing children about sexual abuse it was normal for them to be embarrassed and to disclose information gradually in a piecemeal manner" in light of the Florida Supreme Court's decision in *Floyd v. State*, 569 So. 2d 1225 (Fla. 1990). [DE 10 at 35]. Relying upon that case, the State argues that Ms. Muehlberg's testimony "was based on permissible lay observation and ordinary child protection team experience." *Id.* at 36. Indeed, the State maintains that Ms. Muehlberg testified as a lay witness and not an expert in this case, and that no *Richardson* hearing or inquiry was required. *See id.* at 37. But in any event, the State argues that any purported error is harmless beyond a reasonable doubt "and not subject to relief via a federal habeas corpus petition." *Id.* at 38.

c.   Reply

Petitioner asserts that the State's argument that Ms. Muehlberg was merely providing lay observation is "specious." [DE 17 at 12]. According to Petitioner, "the prosecution's response at trial that the witness was testifying from her training and experience . . . essentially amounts to an admission that the testimony was from an expert." *Id.* Thus, "the jury would clearly treat Ms. Muehlberg's testimony based on her training and experience as expert testimony." *Id.*

d.  <u>Legal Standard & Analysis</u>

Under Florida Rule of Criminal Procedure3.220(b)(1)(A), the State must disclose "a list of the names and addresses of all persons known to the prosecutor to have information that may be relevant to any offense charged or any defense thereto, designated into three categories of witnesses." *See* Fla. R. Crim. P. 3.220(b)(1)(A). Under Category A, the State must disclose "expert witnesses who have not provided a written report and a curriculum vitae or who are going to testify." Fla. R. Crim. P. 3.220(b)(1)(A)(i).

"Florida's criminal discovery rules are designed to prevent surprise by either the prosecution or the defense. Their purpose is to facilitate a truthful fact-finding process." *Scipio v. State*, 928 So. 2d 1138, 1144 (Fla. 2006) (quoting *Kilpatrick v. State*, 376 So. 2d 386, 388 (Fla. 1979)). When the State commits a discovery violation, it is incumbent upon the trial court to conduct a *Richardson*[12] hearing. *See Luis v. State*, 851 So. 2d 773, 776 (Fla. 2d DCA 2003). "During a *Richardson* hearing, the trial judge is required to inquire (1) whether the violation was inadvertent or willful, (2) whether it was trivial or substantial, and (3) whether noncompliance . . . has prejudiced the opposing party's ability to properly prepare for trial." *Flores v. State*, 872 So. 2d 441, 443 (Fla. 4th DCA 2004) (quoting *Acosta v. State*, 856 So. 2d 1143, 1144 (Fla. 4th DCA 2003)). Pursuant to *State v. Schopp*, 653 So. 2d 1016 (Fla. 1995), only if a court acting in an appellate capacity "can determine beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless." *Scipio*, 928 So. 2d at 1150.

---

[12] *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

"Generally, a lay witness may not testify in terms of an inference or opinion, because it usurps the function of the jury." *Williams v. State*, 300 So. 3d 202, 209 (Fla. 4th DCA 2020) (quoting *Jones v. State*, 95 So. 3d 426, 429 (Fla. 4th DCA 2012)). However, under section 90.701, Florida Statutes:

> If a witness is not testifying as an expert, the witness's testimony about what he or she perceived may be in the form of inference and opinion when:
>
> (1)     The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
>
> (2)     The opinions and inferences do not require a special knowledge, skill, experience, or training.

§ 90.701, Fla. Stat. "Lay witness opinion testimony is admissible if it is within the ken of an intelligent person with a degree of experience." *Floyd v. State*, 569 So. 2d 1225, 1232 (Fla. 1990). "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *L.L. v. State*, 189 So. 3d 252, 258 (Fla. 3d DCA 2016) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment) (emphasis omitted).

Here, the State questioned Ms. Muehlberg as to whether it is "normal for a child in [her] experience interviewing them about these subjects to disclose information slowly or gradually or in pieces." [DE 11-1 at 1025]. Defense counsel objected based on relevancy, and then objected again and stated that Ms. Muehlberg was not listed as an expert in the case and that the State was "eliciting basically an expert opinion from her." *Id.* at 1026. In response, the State indicated that

Ms. Muehlberg was testifying as to whether it was "unusual for a child to disclose information gradually on the topic such as this" based on her "training and experience." [DE 11-1 at 1026]. The trial court stated that it did not believe Ms. Muehlberg was testifying as an expert and overruled the objection. *Id.* at 1026–27.

Ms. Muehlberg's testimony that it was not unusual for children to disclose information in a piecemeal fashion is more akin to a process of reasoning which is familiar in everyday life as opposed to reasoning which can be mastered only by specialists in the field. *L.L.*, 189 So. 3d at 258. Simply stated, whether children disclose information gradually or all at once would be obvious to a lay witness. Nonetheless, Petitioner argues that Ms. Muehlberg was *required* to be listed as an expert and that a *Richardson* inquiry was therefore necessary because of the State's failure to list Ms. Muehlberg as an expert witness.

In support of his position that Ms. Muehlberg was required to be listed as an expert witness, Petitioner cites to *Luis v. State*, 851 So. 2d 773 (Fla. 2d DCA 2003). In *Luis*, the State failed to list an officer as an expert witness but later elicited testimony at trial that—based upon the officer's experience—"the most common container for carrying crack cocaine is a cigar tube." *Id.* at 775. The officer also testified as to several "factors to be considered in determining whether drugs are intended for personal use or for sale" and testified that it was his opinion (based on both training and experience) that the defendant's possession of cocaine in that case was for sale to others rather than for his own personal use. *Id.* On appeal, in noting that there had been a discovery violation,[13] the appellate court found the trial court's failure to conduct a *Richardson* hearing to be harmful because, other than the officer's testimony, "the only evidence establishing that [the defendant]

---

[13] In *Luis*, it does not appear that the State argued the officer's testimony constituted lay witness testimony.

had any intent to sell the cocaine was his alleged post-*Miranda* statement that he had 'just started selling cocaine,'" which the defendant denied making. *Id.* at 777.

In the instant case, however, Ms. Muehlberg's testimony was far more minimal than the officer's testimony in *Luis*, and her testimony likely constituted permissible lay witness testimony for which she did not need to be listed as an expert. Moreover, Ms. Muehlberg did not testify concerning her opinion on the defendant's guilt. In any event, even assuming Ms. Muehlberg *did* give expert testimony, there is no question that any purported error in failing to list Ms. Muehlberg as an expert witness or to hold a *Richardson* inquiry is harmless. This is because, at that point in trial, Dr. Rapa had already testified about a child's memory and how a child reacts to sexual abuse. Thus, unlike in *Luis*, there was additional duplicative testimony. And, Petitioner's argument that he was procedurally prejudiced is without merit, as defense counsel could not have been prejudiced in preparing to rebut the same testimony that had already been elicited from Dr. Rapa.

Accordingly, Petitioner has failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law, or that such rejection is based on an unreasonable determination of facts. The Undersigned United States Magistrate Judge therefore **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground Six.

### vii.   Ground Seven: The state trial court erred in denying Petitioner's motion for a jury of twelve persons for the capital sexual battery trial

a.  Petition

Petitioner contends that "[t]he lack of a twelve-person jury violated [his . . . right to a fair and impartial jury pursuant to the Sixth Amendment to the United States Constitution." [DE 1 at 43]. While Petitioner acknowledges that Florida "is one of only three states that regularly use six

jurors to decide the outcome of non-petty criminal cases," and additionally acknowledges that "a majority of the Supreme Court [has] held that the Sixth Amendment guarantee to trial by jury d[oes] not require that the constitutionally mandated jury be composed of twelve members," Petitioner argues that "[s]ubsequent developments in the Supreme Court's Sixth and Fourteenth Amendment jurisprudence dictate that the result in *Williams* [*v. Florida*, 399 U.S. 78 (1970)] be reconsidered." *Id.* at 43–44.

To this end, Petitioner provides a thorough analysis of: (1) *Williams*; (2) the origins of the twelve-person jury and the Framers' intent for the American criminal jury system; and (3) the United States Supreme Court's recent Sixth Amendment jurisprudence, arguing both that "the holding in *Williams* should be reexamined in light of the Supreme Court's recent Sixth Amendment jurisprudence" and that the state trial court erred in denying Petitioner's motion for a jury of twelve persons. *Id.* at 44–49. In light of the foregoing, Petitioner argues the denial of his motion constituted an "unreasonable determination of the facts in light of the evidence contained in the state court record" and that the state court's erroneous ruling was "contrary to and an unreasonable application" of his constitutional rights. *Id.* at 50.

b.  Response

The State simply argues that Petitioner's claim is without merit, as the Florida Supreme Court "rejected such an argument more than three decades ago in *State v. Hogan*, 451 So. 2d 844 (Fla. 1984)." [DE 10 at 38]. Further, "the United States Supreme Court in *Williams v. Florida*, 399 U.S. 78 (1970) held the Sixth Amendment guarantee to a trial by jury did not require the jury to be composed of twelve members." *Id.*

c.  <u>Reply</u>

Petitioner relies upon the argument in his Petition. [DE 17 at 12]. As stated by Petitioner, "[f]or all the reasons set forth in the § 2254 petition, Petitioner . . . maintains that the holding in *Williams v. Florida*, 399 U.S. 78 (1970), should be reexamined in light of the Supreme Court's recent Sixth Amendment jurisprudence." *Id.* at 12–13.

d.  <u>Legal Standard & Analysis</u>

Under *State v. Hogan*, 451 So. 2d 844 (Fla. 1984), "[s]exual battery of a child, . . . while still defined as a 'capital' crime by the legislature, is not capital in the sense that a defendant might be put to death." *Id.* at 845. "Because the death penalty is no longer possible for crimes charged under subsection 794.011(2), a twelve-person jury is not required when a person is tried under that statute." *Id.* Indeed, the propriety of a six-person jury in Florida has been met with approval in *Williams v. Florida*, 399 U.S. 78, 103 (1970). In that case, the United States Supreme Court explicitly "conclude[d] that [a] petitioner's Sixth Amendment rights, as applied to the States through the Fourteenth Amendment, [a]re not violated by Florida's decision to provide a six-man rather than a 12-man jury." *Williams v. Florida*, 399 U.S. 78, 103 (1970).

Here, the trial court denied Petitioner's motion for a twelve-person jury. [DE 11-2 at 132; DE 11-1 at 407]. Such a denial was in accordance with precedent from both the Florida Supreme Court and the United States Supreme Court, pursuant to *Hogan* and *Williams*, respectively. Indeed, Petitioner acknowledges the law but asserts that Florida's usage of a six-person jury should be reexamined and preserves his argument "for subsequent review." [DE 17 at 13].

The Undersigned is certainly sympathetic to Petitioner's well-stated claim that he was deprived a fair and impartial jury under the Sixth Amendment due to the trial court's denial of his

motion for a twelve-person jury. It appears that the State of Florida is an outlier on this issue as it is one of only two or three states that allow six person juries in serious cases such as Petitioner's capital sexual battery trial. In this regard, even within Florida itself, post-*Hogan*, Florida's appellate courts have called a six-person jury in such cases into question. *See Palazzolo v. State*, 754 So. 2d 731, 737 (Fla. 2d DCA 2000) (stating that there "may be merit to a rule of procedure requiring a jury of twelve in" capital sexual battery cases); *Gonzalez v. State*, 982 So. 2d 77, 78 (Fla. 2d DCA 2008) ("The common-law tradition of twelve jurors for . . . important criminal cases is overwhelmingly recognized as the better policy throughout the United States."). Moreover, and importantly, following *Williams*, more recent United States Supreme Court precedent also seemingly calls into question the approval of a six-person jury in such cases. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) ("[T]rial by jury has been understood to require that 'the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of the defendant's equals and neighbours.'" (emphasis and citation omitted)); *see also Blakely v. Washington*, 542 U.S. 296, 301 (2004) (referring to the "truth of every accusation" against a defendant being confirmed by the "unanimous suffrage of twelve of [a defendant's] equals and neighbors" as a "longstanding tenet[] of common-law criminal jurisprudence"); *S. Union Co. v. United States*, 567 U.S. 343, 356 (2012) (same). The fact that the United States Supreme Court specifically referenced the importance of twelve jurors in *Apprendi* (and in other subsequent cases) may be telling and indicative of a potential change in this area of the law. Thus, the State of Florida's continued use of six person juries in serious criminal cases such as the instant one where a conviction results in a life sentence or multiple life sentences is certainly subject to question, debate, review, and concern.

60

However, to date, neither the Florida Supreme Court nor the United States Supreme Court has explicitly ruled that six person juries are impermissible in serious criminal cases such as Petitioner's case. As it currently stands, a twelve-person jury is neither mandated by Florida nor United States Supreme Court precedent. While these lines of cases are certainly subject to challenge in an appropriate case, they remain good law. This Court is required to follow binding precedent and it must do so here. Accordingly, the Undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the United States District Judge **DENY** Petitioner's Petition as to Ground Seven.

    viii.   **Ground Eight: The jury instruction on sexual battery was reversible error because it misstated a material element that the State had to prove – penetration or union.**

    a.   Petition

According to Petitioner, he was

> charged with, and convicted of, sexual battery. The statute requires proof of penetration or union, but the state trial court instructed the jury that the State only needed to prove 'contact' in that it instructed the jury that union 'means contact.' Petitioner . . . objected to this instruction and the state trial court overruled the objection based on the instruction being a standard instruction. . . . Although the instruction conformed to the standard instructions, it was contrary to the sexual battery statute.

[DE 50 at 1]. Stated differently, Petitioner argues that section 794.011, Florida Statutes, does not say that "union" means contact, and that it is "reasonable for the Legislature to treat penetration and union as worse than contact." *Id.* at 51. Indeed, according to Petitioner, "[m]ere contact forms the basis of the crime of lewd or lascivious molestation, so requiring proof of more than just 'contact' is logical." *Id.*

61

Thereafter, Petitioner cites to *Seagrave v. State*, 802 So. 2d 281 (Fla. 2001), a case which Petitioner contends distinguishes between "contact" and "union" in the context of the assessment of points under the Criminal Punishment Code. *Id.* at 51–52. Petitioner additionally argues that, if the Legislature meant for "union" to mean "contact," it would have said so, and that the Florida Legislature has differentiated between "union" and "contact" in a variety of other statutes regarding sexual offenses. *Id.* at 53. Moreover, Petitioner argues that the adoption of standard jury instructions "does not amount to a ruling on their correctness," and that, "[a]s a matter of plain English, union is not synonymous with contact." *Id.* at 54–55.

b.   Response

The State argues that Petitioner's "argument on this issue must fail because it is not cognizable in a federal habeas corpus petition." [DE 10 at 39]. That being said, the State argues that "the standard jury instruction for sexual battery [in this case] adequately addressed the applicable legal standard," because in *Tirado v. State*, 219 So. 3d 146 (Fla. 4th DCA 2017), the court "held that the trial court did not commit fundamental error by instructing the jury in a sexual battery case that 'union means contact.'" *Id.* Further, the State also argues that Petitioner "has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts." *Id.* at 40.

c.   Reply

Petitioner again relies upon the argument in his Petition. [DE 17 at 13].

d.  <u>Legal Standard & Analysis</u>

The Florida Supreme Court's "approval of the standard jury instructions does not relieve the trial judge of his [or her] responsibility of correctly charging the jury." *Yohn v. State*, 476 So. 2d 123, 126 (Fla. 1985). Pursuant to section 794.011(2)(a), Florida Statutes (2016), "[a] person 18 years of age or older who commits sexual battery upon, or in an attempt to commit sexual battery injures the sexual organs of, a person less than 12 years of age commits a capital felony, punishable as provided in ss. 775.082 and 921.141." § 794.011(2)(a), Fla. Stat. (2016). The statute defines sexual battery as "oral, anal, or vaginal penetration by, or *union* with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual battery does not include an act done for a bona fide medical purpose." § 794.011(1)(h), Fla. Stat. (2016) (emphasis added).

The Florida Standard Criminal Jury Instructions define "union" as meaning "contact." Fla. Std. Jury Instr. (Crim.) 11.1. Florida's Fourth District Court of Appeal has explicitly approved of this standard jury instruction for sexual battery, finding that a trial court "did not err in giving the standard jury instruction that 'union means contact.'" *Tirado v. State*, 219 So. 3d 146, 149 (Fla. 4th DCA 2017). In doing so, the Fourth DCA specifically noted that "the standard jury instruction [defining "union" as meaning "contact"] is consistent with the Florida Supreme Court's decision in *Seagrave v. State*, 802 So. 2d 281 (Fla. 2001), which dealt with the assessment of victim injury points for 'sexual contact.'" *Id.* at 148–49.

Despite the Fourth DCA's contention that the applicable standard jury instruction is consistent with *Seagrave*, Petitioner relies upon that same case to instead argue that "the Florida Supreme Court has held that union is not synonymous with contact." [DE 1 at 51]. Specifically,

Petitioner cites the following passage from *Seagrave* to argue that the Florida Supreme Court has held that "union" and "contact" are not the same:

> Judge Peterson, in his dissenting opinion in *Kitts,* based his opinion that the imposition of victim injury points was limited to crimes that rose to the level of a sexual battery in part on the fact that "[u]nion means contact according to the standard jury instructions given in sexual battery cases." 766 So.2d at 1070. We do not disagree that the standard jury instructions for sexual battery define "union" as "contact" and that a definition of "contact" *includes* "union." However, the term "sexual contact" encompasses a broader range of conduct than does the term "union" with regard to acts of sexual battery because the sexual battery statute limits the contact to the "union" between the sexual organ of one and the oral, anal or vaginal opening of another. If the Legislature had intended to limit sexual contact points to offenses involving union for the purposes of the sexual battery statute, then it would have used the word "union" in section 921.0011(7)(b) 2., rather than the more inclusive word "sexual contact."

*Seagrave*, 802 So. 2d at 287 (footnote omitted). However, as can clearly be seen by the applicable passage, the *Seagrave* court was discussing "sexual contact" and the fact that "sexual contact" encompassed a broader meaning than "union," which the court essentially equated with "contact" for purposes of the sexual battery statute. *See id.* Thus, Petitioner's argument misses the mark and fails to recognize the distinction the *Seagrave* court drew between "sexual contact" and "contact."

In the instant case, defense counsel argued that "union actually can't mean contact" and "has to mean something more than that," relying upon *Seagrave* in support of such argument. [DE 11-1 at 1156, 1163]. However, the trial court stated it was inclined to use the standard jury instruction, and ultimately gave the instruction that "union" means "contact." *Id.* at 1157, 1165. Because the Fourth DCA has specifically approved of the standard jury instruction, and because the Florida Supreme Court's decision in *Seagrave*—as noted by the court in *Tirado*—is consistent with "union" meaning "contact" for purposes of section 794.011, Florida Statutes, the Court finds that the trial court did not err in giving the standard jury instruction.

64

That being said, in the first instance, "[a] jury instruction that was allegedly incorrect under state law is not a basis for habeas relief, because federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 688 (11th Cir. 2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 68, 71–72 (1991) (internal quotation marks and citations omitted)). Accordingly, not only does Petitioner's argument fail on the merits, but Petitioner's argument is not a basis for federal habeas relief. Petitioner has thus failed to show the Florida courts' rejection of this claim is contrary to, or an unreasonable application, of clearly established federal law, or that such rejection is based on an unreasonable determination of facts. The Undersigned United States Magistrate Judge therefore **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** the Petition as to Ground Eight.

## V.    <u>CERTIFICATE OF APPEALABILITY</u>

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b) to the Rules Governing § 2254 Proceedings.

After a careful review of the record, the Court finds that Petitioner is entitled, in part, to a certificate of appealability. "A certificate of appealability may [be] issued[d] . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To merit a certificate of appealability, Petitioner must show that reasonable jurists

would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *see also Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Further, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 332, 338 (2003). And, a certificate of appealability may be issued as to one issue. *See McClain v. Hall*, 552 F.3d 1245, 1254 (11th Cir. 2008).

Because Grounds One through Six and Ground Eight in the Petition are without merit, Petitioner cannot satisfy the *Slack* test as to those claims. However, Ground Seven presents an intriguing question and a more nuanced and debatable discussion. As to Ground Seven, while it appears that the United States Supreme Court and the Florida Supreme Court case law currently does authorize a six-person jury in a capital sexual battery case (such as the case involving Petitioner), the Court finds Petitioner's argument for a change in that case law to have some arguable merit. Indeed, in the many years since *State v. Hogan*, 451 So. 2d 844 (Fla. 1984), Florida's appellate courts have continued to recognize that a jury of twelve persons is the better policy in serious criminal cases. *See Palazzolo v. State*, 754 So. 2d 731, 737 (Fla. 2d DCA 2000) (stating that there "may be merit to a rule of procedure requiring a jury of twelve in" capital sexual battery cases); *Gonzalez v. State*, 982 So. 2d 77, 78 (Fla. 2d DCA 2008) ("The common-law tradition of twelve jurors for . . . important criminal cases is overwhelmingly recognized as the better policy throughout the United States."). Moreover, despite the United States Supreme Court's approval of a six-person jury in *Williams v. Florida*, 399 U.S. 78 (1970) and its focus on the "function" of a jury trial in doing so, the United States Supreme Court has since focused instead

on the "historical foundation" of the jury trial and has explicitly acknowledged and approved that "trial by jury has been understood to require that 'the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of the defendant's equals and neighbours.'" *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (emphasis and citation omitted). In light of the evolving case law, the Supreme Court's comments in *Apprendi*, and the facts underlying Ground Seven, the Undersigned does find that the Petitioner has met the *Slack* test as to Ground Seven.

Accordingly, upon careful consideration of the record as a whole, the Undersigned United States Magistrate Judge **RESPECTFULLY RECOMMENDS** that the United States District Judge **DENY** a certificate of appealability as to Grounds One through Six and Ground Eight, but **GRANT** a certificate of appealability as to Ground Seven.[14] Specifically, the issue of whether a six-person jury in a capital sexual battery case which resulted in Petitioner receiving two consecutive life imprisonment terms, violates Petitioner's Sixth Amendment Constitutional rights as applied to the States (and to Florida in particular) through the Fourteenth Amendment, is one which is worthy of review.

## VI.   RECOMMENDATION TO THE DISTRICT JUDGE

A very careful review of the entire record establishes that Petitioner's claims are due to be denied for the reasons stated above. Accordingly, the Undersigned United States Magistrate Judge recommends that the United States District Judge **DENY** Petitioner Donald Buhler's Petition

---

[14] The Court specifically finds that, while there is some question as to whether Petitioner properly exhausted *all* of his claims, Petitioner has properly exhausted his claim under Ground Seven. Further, the Court notes that Petitioner did not request an evidentiary hearing in this case. In any event, the Court finds that no evidentiary hearing is required on any of the grounds raised by Petitioner because Petitioner has failed to demonstrate the existence of any factual dispute that warrants a federal evidentiary hearing.

under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody [DE 1]. Further, as discussed above, the Undersigned recommends that the District Judge grant a certificate of appealability as to Ground Seven.

## NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge Donald M. Middlebrooks. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 26th day of January, 2024.

WILLIAM MATTHEWMAN
United States Magistrate Judge

68